# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-KA-01569-SCT

*TEVIN JAMES BENJAMIN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2010 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT B. MCDUFF |
| | MICHAEL P. ADDIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | ANTHONY N. LAWRENCE, III |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 06/06/2013 |

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.     A Jackson County jury found Tevin James Benjamin guilty of capital murder with the underlying felony of robbery, and the court sentenced him to life in the custody of the Mississippi Department of Corrections (MDOC) without the possibility of parole. Benjamin has appealed.  We find that Benjamin's statement to the police was taken in violation of his rights under ***Miranda v. Arizona***, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Therefore, we reverse and remand for a new trial. We do not address Benjamin's other issues.

# FACTS

¶2.     On October 23, 2008, Michael and Linda Porter were traveling to Pascagoula to watch Linda's grandson play football. It was a dark, rainy night. At approximately 6:50 p.m., they stopped at a Conoco gas station in Moss Point to ask for directions to the football stadium. The Conoco was on the corner of Peters Street and Highway 63. Michael, who was driving, pulled in front of the gas station, parallel to the pumps, with the front of the car facing Peters Street. He exited the car to go into the gas station, and Linda stayed in the car. She saw three young men standing in front of the car, one with a white towel over his head. About ten seconds later, two of the men walked past the car, and she heard a commotion in the rear of the car. She looked through the rear window and saw two of the men attacking Michael, while the third man with the white towel kept watch on her. Michael wrestled with the men and managed to open the driver's side door, push them off, get inside the car, and slam the door on them. Once inside the car, Michael held the door shut with his right hand and attempted to work the gear shift with his left hand. The man with the white towel approached the car, aimed a gun at Linda, and then at Michael, and fired. The bullet struck Michael in the chest. The assailants fled. Michael managed to get the car in gear and drive away, but quickly succumbed to the bullet wound. Linda stopped the car and ran to a nearby house for help. When the police and paramedics arrived, Michael was transported to Singing River Hospital, where he was pronounced dead.  Linda was unable to identify the assailants, whom she described as black males in their early twenties.

¶3.     The police arrested Benjamin, Darwin Wells, Terry Hye, and Alonzo Kelly in connection with the crime. It was determined that Wells had fired the fatal shot. The police

2

searched Wells's home and found a handgun. Carl Fullilove with the Mississippi Crime Laboratory testified that the bullet that had killed Michael Porter had been fired from that gun.

¶4.    Kelly, who was indicted and pleaded guilty as an accessory after the fact, was a key witness at Benjamin's trial. Kelly testified that, the morning of the crime, Hye and Benjamin had come to his house. Hye talked to Wells on the phone about "hitting a lick"[1] to get money to go to the county fair. Then, the three left Kelly's house and met Wells at the Little Super gas station on Highway 63. They left shortly, and Wells got into a fight, and the four were stopped by police, frisked for weapons, and released. Kelly and Hye spent the rest of the afternoon together, but Wells and Benjamin each went their separate ways until all four men met again at around 5 or 6 p.m. They returned to the Little Super. Wells wanted to "hit a lick" at the Conoco. On the walk to the Conoco, Wells showed the other individuals that he had a gun. At the corner of Gregory and Peters Streets, Kelly stopped and refused to accompany the others to the Conoco. He waited at the intersection while the others proceeded down Peters Street toward the Conoco. He testified that he briefly looked away, then looked back and saw Benjamin and Hye standing near the end of the street. He turned around, and about ten seconds later, he heard a gunshot and saw Benjamin, Hye, and Wells running back toward him. Kelly ran with them to Wells's house, and then they split up. The next day, they met at Wells's house and discussed what to say if they were caught. Kelly testified that Benjamin planned to say he was at the fair at the time of the crime.

¶5.    Benjamin told the police that he, Kelly, and Hye were at the fair at the time of the

---

[1] Kelly testified that "hit a lick" meant a robbery.

3

crime. He claimed to know nothing about the shooting. Jerry Givens, a trusty at the jail where Benjamin was incarcerated awaiting trial, testified that Benjamin had given him a note to pass to Hye. Givens testified that he read the note, threw it away, and told Hye about its contents. Givens testified that the note indicated that Benjamin wanted to get a story together with Hye before trial. Givens testified that the note stated Benjamin and Hye were going to "hit a lick" at the Conoco by getting BC powder to make fake cocaine to "sell . . . to a dummy" when they heard a gunshot and ran away. Givens also stated the note indicated Kelly said "they were stupid for shooting the dude." Givens also testified that an officer caught him with a note from Hye to Benjamin. The State used Benjamin's statement to the police that he had been at the fair and his note to Hye, to argue that Benjamin had lied about his whereabouts during the crime. The State also argued that Benjamin's false statement to the police that he had been at the fair corroborated Kelly's testimony that Benjamin had planned to use the fair as his alibi.

¶6.     The jury found Benjamin guilty of capital murder with the underlying felony of robbery. He was sentenced to life without the possibility of parole.

## DISCUSSION

### I. WHETHER BENJAMIN'S STATEMENT WAS OBTAINED IN VIOLATION OF *MIRANDA*.

¶7.     Benjamin was fourteen years old at the time of the crime. A few days after the shooting, Officer Miller questioned Benjamin in the presence of his mother and a second, unidentified police officer. The conversation was recorded on audio and video. Officer Miller read Benjamin his ***Miranda*** rights, but Benjamin asked for his youth-court attorney. *See*

4

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Officer Miller

stated that Benjamin would not be in youth court because he was being "charged in the . . .

capital murder out at the . . . Conoco gas station." Benjamin expressed surprise that he was

being charged with capital murder. Then, the following occurred:

Miller: Who is your lawyer?

Benjamin: Mrs. Brenda Lotts.

Miller: Brenda Lott is a . . .

Officer: I know Brenda. Down in Youth Court.

Miller: She's, she's, you're gonna have to talk to uh, I don't think she can come down here but I don't know. I think she's a public defender down at the Youth Court. You won't be going to Youth Court.

Benjamin: Where I'm gonna be staying the night at?

Miller: Right here in the jail.

Mother: You better think about it baby. I'm telling you cause you know dern well I don't have no money for no lawyer.

Benjamin: So ya'll saying if I don't talk to ya'll, ya'll just going to charge me with it.

Miller: We're going to detain you, yes.

Benjamin: It's just that I don't even know nothing about no murder.

Miller: Ok.

Benjamin: That's what I'm saying.

Miller. Ok. You'll have to tell your lawyer.

Benjamin: I ain't trying to stay the night here, so could I, you know, I ain't did nothing.

5

> Miller: Ok, you'll have to tell your lawyer all of that and then they'll tell us all of that.
>
> Officer: Ok. That's all we can do. He asked for his lawyer, so.

At that point, Miller looked at Benjamin's mother and said "The only way that anything will change is if he request a, you know, request it. And uh, I can't, I can't pressure him into changing his tune about wanting a lawyer, you know, and that kind of stuff. So, if you want to speak to him for a few minutes then, you know, we'll go from there." Miller and the officer exited the room, leaving Benjamin alone with his mother.

¶8.    As shown by the following excerpts from their conversation, Benjamin's mother immediately began pressuring Benjamin into relinquishing his request for an attorney and talking to the police:

> Mother: T.J. I'm telling you now. If you know something, you did something, you better let them know.
>
> Benjamin: Know what, I ain't did nothing. That's what I'm telling, that's what I'm steady trying to say.
> . . . .
>
> Mother: See, see what I told you. If you'd just learn to listen to me. That's why I keep telling you and Trell. Ya'll put me in predicaments. You know I ain't got no money for no lawyer. And then if they get a public defender you know how they work.
> . . . .
>
> Mother: Should have do the questioning and told what you know.
>
> Benjamin: What I know about what?
>
> Mother: I don't know. You have to let them go through the questions with you.

After a few minutes, Miller returned to the room. Benjamin's mother asked what Benjamin had to do if he was going to talk. Miller responded:

6

Well he's gonna have to probably request it that he talks to somebody at this point. But uh, it may be best to just wait until tomorrow and talk, you know, you know, and let him stay back there in jail tonight. Well uh, we got all we need. We don't really need to talk to him. We just wanted his side of it. And if he don't want to give it to us that's fine you know. We'll we'll eventually uh, eventually I'm sure that he'll either tell his attorney or tell the judge or tell somebody while . . .

When Miller said that Benjamin would stay the night in jail, he looked directly at Benjamin.

Miller said he was trying to get Benjamin's side of the story, but that they had no problems with it if he wanted to work through it with an attorney. Then, the following occurred:

Mother: So what, why, what you oh so you just saying let him stay here?

Miller: He's going to have to stay here with us, yes ma'am. It's a capital offense and that's happened. It's a capital murder, ok. Uh, and it's our position at this point uh, that he had some involvement in it to the extent we're not 100% sure that was what was going on. We're going to let him line that out for us. Um, and you know um, we if he wants a lawyer, that's what we're going to honor. So you can probably uh, go ahead and say your goodbyes I guess and he'll be in the big boy jail tonight.

Miller asked Benjamin to empty his pockets and patted him down. Miller asked his mother if she wanted to say goodbye, and she said yes. Miller said "Tell her you love her and hug her neck son, she's the only one on your side right now." Then, Miller and the officer again left Benjamin alone with his mother. Their further conversation was not recorded.

¶9.    Miller testified at the suppression hearing that Benjamin's mother emerged from the interview room and said that Benjamin wanted to talk. The police recorded his subsequent interview with Officers Miller and Roberts. At the beginning of the interview, Miller said "What's the deal? You want to talk to us?" Benjamin responded, "I just want to let you know sir, I don't, you said ya'll charge me." Miller read Benjamin his *Miranda* rights, and Benjamin said he understood. Then, Miller continued questioning Benjamin about whether

7

he wanted to talk. Benjamin said that he wanted to talk and had requested to talk to the police. Then, the following occurred:

Benjamin: Can I say something right quick sir?

Miller: You can say anything you want to buddy, it's your interview.

Benjamin: So uh, when we get done am I still gonna be getting locked up?

Miller: Well that has a lot to do with what you talk about and everything. Uh, that has a lot to do with that dude.

Miller testified that, although he told Benjamin that whether he stayed in jail depended on what he said to the police, in fact it was a virtual certainty that Benjamin would be incarcerated that night no matter what he told the police. Benjamin gave a statement in which he claimed that he was at the fair on the night of the shooting. This statement corroborated Kelly's testimony that Benjamin and the others had concocted alibis after the shooting, and that Benjamin had planned on saying he was at the fair. Although the officers and Benjamin's mother continued to pressure Benjamin to "tell the truth," Benjamin did not depart from his statement that he had been at the fair, and the interview concluded. At the end of the interview, Officer Miller thanked Benjamin's mother "for your help." He also said "Thank you ma'am, we appreciate ya."

¶10.    Benjamin filed a pretrial motion to suppress his statement. He argued that, because the police unconstitutionally reinitiated interrogation after he invoked his right to counsel, his statement was given in violation of *Miranda*.[2] Benjamin claimed that the police had used

---

[2] Benjamin did not challenge the voluntariness of his statement. Therefore, we confine our analysis to the *Miranda* issue.

his mother to prompt his reinitiation of interrogation, and that his waiver of rights was not knowing, intelligent, and voluntary. After hearing the testimony of Officer Miller and viewing the recording of Benjamin's statement, the trial court denied Benjamin's motion to suppress. The trial court found that, after Benjamin had invoked his right to counsel, the officers had made no statements in an attempt to elicit a response, and that Benjamin's waiver of rights was freely, knowingly, and voluntarily made. Benjamin attacks the trial court's ruling.

¶11.    For the accused's statement to be admissible in evidence, "[t]he prosecution must prove beyond a reasonable doubt that [the] statement was given after a valid waiver." *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008). When a trial court has overruled a motion to suppress the confession of a defendant, this Court will reverse the trial court's decision if the ruling was "manifestly in error or contrary to the overwhelming weight of the evidence." *Id.* at 235 (citing *White v. State*, 495 So. 2d 1346, 1347 (Miss. 1986)). This Court also will reverse the admission of a confession if the trial court applied an incorrect legal standard. *Moore v. State*, 933 So. 2d 910, 918 (Miss. 2006).

¶12.    In *Miranda*, the United States Supreme Court held that the Fifth and Fourteenth Amendments' privilege against compelled self-incrimination requires that, before any custodial interrogation may occur, the accused must be informed of his right to counsel and right to remain silent. *Miranda*, 384 U.S. at 444-45, 86 S. Ct. at 1612. Once the accused is informed of these rights, custodial interrogation may proceed provided the accused knowingly, intelligently, and voluntarily waives the rights. *Id.* If the accused chooses to remain silent, then interrogation must cease. *Id.* If the accused invokes his right to counsel,

9

then interrogation must cease until an attorney is present. *Id.* at 474, 86 S. Ct. at 1628.

¶13.   "[I]f the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 493, 83 L. Ed. 2d 488 (1984) (citing *Edwards v. Arizona*, 451 U.S. 477, 485-86 n.9, 101 S. Ct. 1880,1885 n.9, 68 L. Ed. 2d 378 (1981)). "[A]dditional safeguards are necessary when the accused asks for counsel." *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1885.  "[W]hen an accused has invoked his right to . . . counsel . . . a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* "[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85, 101 S. Ct. at 1885. Once an accused has invoked his right to counsel, any subsequent waiver of rights carries a presumption of involuntariness that "ensures . . . police will not take advantage of the mounting coercive pressures of 'prolonged police custody' by repeatedly attempting to question a suspect who previously requested counsel until the suspect is 'badgered into submission.'" *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 1220, 175 L. Ed. 2d 1045 (2010) (citations omitted).

¶14.   It is undisputed that Benjamin was in custody and invoked his right to counsel. He contends that, after he invoked his right to counsel, he was subjected to further interrogation by the police and that his mother acted as an agent for the police for the purpose of extracting

10

his statement. "Interrogation" is not limited to express questioning of a suspect while in custody. *Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S. Ct. 1682, 1698, 64 L. Ed. 2d 297 (1980). The concept also embraces any words and conduct of the police that are the functional equivalent of interrogation. *Id.* at 301, 100 S. Ct. at 1689. Thus, "interrogation" encompasses express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S. Ct. at 1689-90. The determination of whether the police should have known a particular practice was reasonably likely to elicit an incriminating response focuses on the perceptions of the suspect, not the intent of the police. *Id.*

¶15. This Court has held that a private third party may, without realizing that he or she doing so, act as an agent for the police to induce a defendant's statement. *Abram v. State,* 606 So. 2d 1015, 1031 (Miss. 1992) (*overruled on other grounds by Foster v. State*, 961 So. 2d 670, 672 (Miss. 2007)); *Agee v. State*, 185 So. 2d 671, 674 (Miss. 1966); *Clash v. State*, 146 Miss. 811, 112 So. 370 (1927); *Johnson v. State*, 89 Miss. 773, 42 So. 606 (1906). In *Arizona v. Mauro*, 481 U.S. 520, 527, 107 S. Ct. 1931, 1935, 95 L. Ed. 2d 458 (1987), the United States Supreme Court held that Mauro, who had invoked his right to counsel, was not subjected to the functional equivalent of interrogation when the police allowed him to speak with his wife in the presence of an officer and recorded the conversation. The police allowed Mauro to speak with his wife in response to her insistent demands. *Id.* at 523, 107 S. Ct. at 1933. They informed Mr. and Mrs. Mauro that an officer would be present and placed a tape recorder in plain sight. *Id.* at 522, 107 S. Ct. at 1933. During the conversation, Mauro told

11

his wife not to answer questions until a lawyer was present. *Id.* The State used Mauro's statement to rebut his claim that he was insane on the day of the crime. *Id.* at 523, 107 S. Ct. at 1933.

¶16. The Court found that there was no evidence that the police decision to allow Mauro's wife to see him was a psychological ploy that was the functional equivalent of interrogation. *Id.* at 527, 107 S. Ct. at 1935. The Court found Mauro had not been subjected to compelling influences or direct questioning. *Id.* at 529, 107 S. Ct. at 1937. Nor was there any evidence that the police had allowed Mrs. Mauro to see her husband for the purpose of eliciting incriminating statements. *Id.* at 528, 107 S. Ct. at 1936. Viewing the situation from Mauro's perspective, the Court found that "a suspect, told by officers that his wife will be allowed to speak to him, would [not] feel that he was being coerced to incriminate himself in any way." *Id.* The Court held that the conduct of the police was not the functional equivalent of interrogation. *Id.* at 527, 107 S. Ct. at 1935.

¶17. This case stands in contrast with *Mauro*. After Benjamin invoked his right to counsel, interrogation had to cease until an attorney was present. *Miranda*, 384 U.S. at 474, 86 S. Ct. at 1628. Instead, the police continued to interact with Benjamin and with his mother, who repeatedly expressed the desire that Benjamin forego an attorney and talk to the police. Officer Miller announced that Benjamin was being charged with capital murder and that Benjamin was going to spend the night in jail. Although Benjamin repeatedly requested confirmation of his erroneous belief that if he talked, he would not have to spend the night in jail, Officer Miller never corrected Benjamin's false assumption that he could avoid spending the night in jail by talking. Then, with knowledge that Benjamin's mother wanted

12

Benjamin to waive his right to counsel and talk, Officer Miller informed Benjamin's mother exactly what Benjamin would have to do in order to reinitiate questioning, and left her alone with Benjamin. Officer Miller explained that he could not "pressure him into changing his tune about wanting a lawyer," and allowed his mother to speak with Benjamin "for a few minutes," and "we'll go from there." Predictably, Benjamin's mother used her time alone with Benjamin to pressure him to talk. Then, Officer Miller returned to the interview room to assess the situation, and Benjamin's mother asked for clarification on what Benjamin had to do to talk. When Benjamin did not relent, officers readied him for incarceration and again left him with his mother to say goodbye. After that conversation, Benjamin announced that he was ready to talk.

¶18. Benjamin's immaturity is revealed by the fact that his main concern at being charged with capital murder was avoiding a night in jail. When the police encourage a parent to pressure a fourteen-year-old suspect to talk, and the police foster the suspect's mistaken belief that talking would allow him to avoid a night in jail, the police should know their conduct is reasonably likely to elicit an incriminating response. By encouraging Benjamin's belief that, by talking to the police, he could avoid a night in jail, and by allowing Benjamin's mother to speak with him after instructing her on how Benjamin could reinitiate questioning, the police used psychological ploys and compelling influences to elicit Benjamin's statement. These tactics constituted the functional equivalent of interrogation, because they were reasonably likely to elicit an incriminating response from fourteen-year-old Benjamin. We find that Benjamin was subjected to interrogation after invoking his right to counsel in violation of *Edwards v. Arizona*. *Edwards*, 451 U.S. at 484-85, 101 S. Ct. at 1885.

13

¶19.    Under *Edwards*, Benjamin's waiver was presumptively involuntary because it was made in response to interrogation after Benjamin had invoked his right to counsel. *Shatzer*, 559 U.S. at ___, 130 S. Ct. at 1220. Further, the facts condemn any notion that the prosecution proved beyond a reasonable doubt that Benjamin's waiver was knowing and intelligent. A knowing and intelligent waiver must be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141, 89 L. Ed. 2d 410 (1986). Benjamin's mother was under the false impression that it would be helpful to Benjamin to cooperate and waive his rights. She also communicated that he should talk to the police because they could not afford an attorney. It is manifestly apparent that Benjamin conceded to pressure from his mother and to his desire to avoid a night in jail in deciding to waive his rights. Benjamin's youth rendered him particularly susceptible to parental pressure. Under these circumstances, we cannot say that the record demonstrates that Benjamin's waiver was made with full awareness of the nature of the right and the consequences of abandoning it.

¶20.    For the foregoing reasons, we find that the trial court manifestly erred in failing to suppress Benjamin's statement to the police. The record reflects that the police subjected Benjamin to interrogation after he had invoked his right to counsel and that the State failed to prove his waiver of rights was knowing, intelligent, and voluntary. We reverse and remand for a new trial consistent with this opinion.

## CONCLUSION

¶21.    The trial court manifestly erred in denying Benjamin's motion to suppress his statement to the police, which was given in violation of *Miranda*. We reverse the verdict and

14

sentence and remand the case to the Jackson County Circuit Court for a new trial.

¶22.    **REVERSED AND REMANDED.**

        **WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, KING AND COLEMAN, JJ., CONCUR. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.**

        **PIERCE, JUSTICE, DISSENTING:**

¶23.    Respectfully, I dissent from the majority's decision to reverse the conviction and sentence and remand this case for a new trial.  In my opinion, the record supports the trial court's ruling that Tevin Benjamin knowingly, intelligently, and voluntarily waived his right to have counsel present during questioning after previously having invoked that right.

¶24.    As noted by the majority, the United States Supreme Court held in ***Rhode Island v. Innis***, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L. Ed. 2d 297 (1980):

> [T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under ***Miranda*** refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

(Emphasis added.)  After Benjamin first invoked his right to counsel, Officer Miller informed Benjamin that he was being charged with capital murder and would not be going to youth court, and he asked who was Benjamin's attorney.  In ***Gillett v. State***, 56 So. 3d 469, 486 (Miss. 2010), we held that informing a suspect of the charges against him after the suspect had invoked his right to counsel did not constitute continued interrogation.  Upon hearing he was being implicated in a capital murder, Benjamin asked Officer Miller where he would be spending the night, and Officer Miller told him, "here in jail."  Benjamin began denying that

15

he knew anything about the murder, and Officer Miller responded, telling Benjamin that he would have to discuss that with his lawyer. Officer Miller then told Benjamin's mother, "The only way that anything will change is if he request a, you know, request it. And uh, I can't, I can't pressure him into changing his tune about wanting a lawyer, you know, and that kind of stuff. So, if you want to speak to him for a few minutes then, you know, we'll go from there." The majority contends that this constituted one of a series of psychological ploys and/or compelling influences on the part of Officer Miller. Based on my review of the video-recorded interview, I can no more factually infer the use of psychological or compelling influence on Officer Miller's part from this portion of the video, than if the video had instead–hypothetically–shown Officer Miller abruptly halting the proceeding and immediately escorting Benjamin's mother out of the room, leaving fourteen-year old Benjamin alone to await the booking process. Further, I find nothing inherently coercive in the fact that Officer Miller told Benjamin's mother what Benjamin would have to do if he wanted to talk after having asserted his right to counsel. This was an accurate statement by Officer Miller, for purposes of *Innis*, and Officer Miller made no promises or threats in conjunction with it.

¶25. Afterward, Benjamin and his mother spoke to one another alone. Benjamin told his mother what he later told Officer Miller, that he was at the fair at the time of the murder. Benjamin's mother did encourage Benjamin to talk, and she then asked Officer Miller what Benjamin would have to do to talk. Even though Officer Miller equivocated with his response, he nonetheless bluntly informed Benjamin and his mother that it was the police's position that Benjamin was involved with the murder, and Officer Miller unequivocally told

16

Benjamin and his mother that Benjamin was going to be detained.

¶26.　Benjamin and his mother again spoke alone, and Benjamin thereafter said he wanted to talk.　Officer Miller asked Benjamin if he wanted to talk without his lawyer present. Benjamin said he did.　Again, Officer Miller informed Benjamin of his ***Miranda*** rights. Again, Benjamin confirmed he understood his rights and signed a written waiver.　Then, before any questioning took place, the following occurred:

> Benjamin: Can I say something right quick sir?
>
> Miller: You can say anything you want to buddy, it's your interview.
>
> Benjamin:　So uh, when we get done am I still gonna be getting locked up?
>
> Miller: Well that has a lot to do with what you talk about and everything.　Uh, that has a lot to do with that dude.

I can see how, by isolating this exchange in a vacuum, it could be interpreted as deceptive. But there is more.　Officer Miller immediately qualified his response as follows:

> Miller:　But I'm going to tell you this right now, and I'm not here to be, nobody's going to be mean to you, mistreat you, or nothing else, ok.　But, I don't want you wasting my time, and I'm not going to waste your time, ok.
>
> Benjamin: Yes, sir.
>
> Miller: I don't want you to lie to me or nothing else.　We've already interviewed a bunch of boys that was involved in this thing.　We know that you're not the shooter, you know.　We have no doubts that you're not the shooter.　But, you're either going to have to tell your side of the story or we're going to go with what everybody else is saying, ok.　Tell me what happened last Thursday evening.

¶27.　We cannot look at statements made by the police in a vacuum in determining whether interrogation occurred; rather, we must view them in light of the circumstances of the

17

interaction between the suspect and the police on the occasion in question. Although Benjamin was fourteen years old at the time in question, Benjamin, as shown by the record, was not unfamiliar with how the system worked, having been exposed to it in the past. He requested his youth-court attorney at the outset of the interview. When Benjamin asked if he was going to be spending the night in jail, Officer Miller, as detailed above, truthfully informed Benjamin of the current state of the investigation. Prior to that, Officer Miller expressly informed Benjamin through the advice of rights form–which, again, Benjamin confirmed he understood–that Benjamin still had the right to stop answering questions at any time until he talked to a lawyer. Benjamin elected to proceed with the interview.

¶28. The record, based on my review of it, does not affirmatively show that Benjamin did not voluntarily and intelligently withdraw his previous request for counsel and waive his *Miranda* rights. Accordingly, I would affirm the trial court's decision not to suppress Benjamin's statement as well as Benjamin's conviction and sentence.

**RANDOLPH, P.J., JOINS THIS OPINION.**