# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-KA-00847-SCT

*JAFRON ROBERTS a/k/a JAFRON LEMUEL*
*ROBERTS a/k/a JAFRON L. ROBERTS*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/05/2016 |
| TRIAL JUDGE: | HON. JUSTIN MILLER COBB |
| TRIAL COURT ATTORNEYS: | KASSIE ANN COLEMAN |
| | LISA J. HOWELL |
| | THOMAS GOODWIN BITTICK |
| | JESSICA LEIGH MASSEY |
| | JOHN CARL HELMERT, JR. |
| | BILBO MITCHELL |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND KING, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     A Lauderdale County jury convicted Jafron Roberts of kidnapping and statutory rape,

but acquitted him of sexual battery. The Circuit Court of Lauderdale County imposed the

maximum penalty for the kidnapping conviction, thirty years, and sentenced Roberts to

thirty-seven years for the statutory rape conviction, to run concurrently with his sentence for

kidnapping. Roberts appeals, arguing that (1) the trial court should have granted his motion to suppress his statement to the police, (2) the trial court should have granted his request for production and *in camera* inspection of medical records, (3) the State's loss of exculpatory evidence denied his right to due process, (4) the trial court should have excluded the testimony of the State's DNA expert, and (5) a pre-indictment delay of approximately one year violated his due process rights.

¶2.     Finding no error, we affirm. Because the police did not violate Roberts's rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the trial court did not manifestly err by denying his motion to suppress his statement. We find that Roberts's attack on the denial of his motion for *in camera* inspection of medical records is procedurally barred; notwithstanding the procedural bar, any error was harmless. And Roberts's argument that the State lost defense evidence is procedurally barred for his failure to bring the issue to the attention of the trial court; notwithstanding the procedural bar, it is without merit. The trial court committed no abuse of discretion in the admission of expert testimony on DNA testing. Finally, Roberts is procedurally barred from arguing that his indictment should be dismissed due to pre-indictment delay, because he never raised that argument before the trial court; notwithstanding the procedural bar, the issue lacks merit.

**FACTS**

¶3.     On the morning of October 1, 2013, Tanya,[1] a thirteen-year-old female, left her home in Meridian, Mississippi, and began walking through her neighborhood in the direction of

---

[1] In accordance with this Court's policy, this minor crime victim has been given a fictitious name to protect her identity.

her middle school. School started at 8:05 a.m., but Tanya was running late that morning due to stomach problems for which she had visited the hospital the night before. Tanya testified that, on her route, she passed a man standing at the open trunk of an automobile. Because the man looked suspicious and no one else was on the street, she quickened her pace. After Tanya had passed the man, he approached from behind, choked her, and thrust her into the vehicle's passenger seat as she struggled to get away. The man drove Tanya through the neighborhood, restraining her with his right hand as she repeatedly attempted to unlock the passenger door and escape. Finally, the man punched her in the face and told her that if she tried to get out of the car, she would not return home.

¶4.     Tanya testified that the man asked her to perform oral sex, but she refused. Then, he stopped the car and forced her to perform oral sex. Tanya said that the man smelled awful, as if he had not bathed in a long time, and she pulled away after a few seconds. The man then drove to an abandoned house, took her inside, and ordered her to undress. When she refused, he informed her that, if she did not comply, she would not return home. Then the man sat in an old recliner, removed his penis from his pants, and ordered Tanya to sit on his penis, which she did, facing away from the man. He told her to "bounce up and down." Tanya complied, but after a brief time she got up because she was loathe to continue. The man masturbated and ejaculated on himself. At that point, Tanya got dressed, but she left her underwear in the house to prove she had been there. Tanya and the man left the abandoned house and he dropped her off approximately one block from where he had taken her.

3

¶5. Although Tanya had a cell phone in her possession, she had been afraid to use it during the kidnapping. Just after the man dropped her off, at 8:25 a.m., she used the phone to call 911 and report that she had been raped and hit in the face. She described her attacker as a light-complected black male driving a black vehicle. Officer Derrick Williams with the Meridian Police Department arrived, and Tanya was transported by ambulance to Rush Foundation Hospital in Meridian.

¶6. At the hospital, a sexual assault nurse examiner (SANE) examined Tanya and prepared a sexual assault kit. Tanya told the SANE that she had been kidnapped on the way to school and driven to an abandoned house. She reported that she had been held down by the wrists and hit in the face, and that her attacker had said that if she tried to get out of the car, he would knock her out. She told the SANE that he had forced her to perform oral sex against her will and also forced her to have intercourse. Tanya reported that, during the intercourse, she had been on top and penetration had occurred. The SANE testified that Tanya was visibly upset and had a two-centimeter bruise on her left cheek. Her shorts were torn and dirty. The SANE testified that there was mild vaginal redness but no bleeding or tears, which were findings consistent with what Tanya said had happened. After the examination, Officer Rita Jack secured Tanya's clothing and the sexual assault kit and later delivered them to the Mississippi Forensics Laboratory.

¶7. Officer Rita Jack, an investigator with the Meridian Police Department, testified that she had interviewed Tanya at the hospital. Tanya described her assailant as a light-complected black male with black eye tattoos on his forearms. She said that his car was

4

sporty with loud-sounding pipes. Tanya reported that the abandoned house had a green roof and was across from a wooded area and had old furniture inside. Officer Jack drove Tanya and her mother through Tanya's neighborhood in an effort to find the abandoned house. But because Tanya had moved to the area recently, she was unable to locate the abandoned house, and Officer Jack proceeded toward Tanya's house to drop off her and her mother. As they approached Tanya's street, they passed a gold Chevrolet Camaro, and Tanya exclaimed, "That's him!" Officer Jack backed up her vehicle to read the Camaro's tag, but the car moved away. Officer Jack followed and radioed for backup. Another officer intercepted the car and Officer Jack pulled up to the scene of the stop. As the officer removed the driver, who was cooperative, from the vehicle, Tanya screamed, "That's him! That's him!"

¶8.     When Officer Jack approached the suspect, she noted that his appearance matched Tanya's description. He was a light-complected black man with forearm tattoos of skulls that had black eyes. The suspect was identified as thirty-year-old Jafron Roberts. He was arrested and transported to the Meridian Police Department, where samples were collected from his person and later submitted to the Mississippi Forensics Laboratory. Roberts had a scratch on the left side of his neck. Officer Jack testified that Roberts's pants were soiled in the front and rear and he had a strong odor. He drove a sports car with loud pipes, as Tanya had said. Officer Jack testified that, although Tanya had reported that her attacker's car was black, Roberts's car was gold with a dark-colored interior. Officer Jack testified that Tanya had reversed the interior and exterior colors of the car in her description. Officer Williams

testified, without objection, that it is not unusual for a victim, under stress, to make that type of mistake. Otherwise, Tanya's description of the assailant and his vehicle was accurate.

¶9.    The next day, investigators located the abandoned house. Consistent with Tanya's description, the house was across from a wooded area, its carport had a green roof, and there was old furniture inside, including a recliner in one room. Police found Tanya's underwear inside the house, and subsequent testing revealed that her DNA was present on the underwear.

¶10.    Three days after the incident, Officer Jack interviewed Roberts for about an hour and fifteen minutes at the police department. She read and explained Roberts's *Miranda* rights. Roberts refused to sign a rights waiver form, but continued talking to Officer Jack. He claimed that, at the time of the alleged crime, he had been at the WIN job center in Meridian, having arrived just before 8:00 a.m. when it opened. He said that he then had gone to the career center in Webb Hall at Meridian Community College, where he had encountered an old high school classmate, Karina Hodges. Later in the interview, Roberts said that he had seen Tanya walking to school and had asked whether she wanted to buy some iPads. After continued questioning, Roberts admitted that he had taken Tanya to a house where they had consensual sex in a chair. He related that the head of his penis had penetrated Tanya's vagina.

¶11.    Brandi Goodman, a serologist with the Mississippi Forensics Laboratory, testified that, based on the presence of p30 proteins, seminal fluid and sperm cells were found on Tanya's pants. Seminal fluid, but not sperm cells, was found on the vaginal and vulvar

swabs. Nathan Holly, a forensic biologist with the Mississippi Forensics Laboratory, testified that only the victim's DNA was found on the vaginal and vulvar swabs. But he also tested a cutting of Tanya's pants on which epithelial cells and sperm cells were found. The epithelial cells tested positive for the presence of Y-STRs. He explained that STRs are repeat sequences found on the Y chromosome, and that a Y-STR test identifies the presence of male DNA. Holly testified that he had obtained a partial Y-STR profile from the cutting from Tanya's pants, and that this partial Y-STR profile did not exclude Roberts and all males in his paternal lineage.

¶12. Roberts was indicted and tried for kidnapping Tanya and confining her against her will at the abandoned house; statutory rape for engaging in sexual intercourse with a minor under the age of fourteen, when he was twenty-four or more months older than she and not her spouse; and sexual battery of a child under fourteen, when he was twenty-four or more months older than she, by putting his penis in her mouth. Roberts asserted an alibi defense and produced a sign-in sheet from the WIN Job Center showing that "Jay Roberts" had signed in at 8:10 a.m. According to the WIN Job Center's branch director, visitors signing in do not have to provide identification, and the sign-in time written down by each visitor is not verified as accurate. Karina Hodges Sims testified that she was at the career center at Webb Hall on October 1, 2013, and she had seen Roberts; but she could not say that she had seen him on October 1, 2013, rather than on one of the many other mornings when she had visited Webb Hall. Roberts had not signed in at Webb Hall on October 1, 2013. The jury found Roberts guilty of kidnapping and statutory rape but acquitted him of sexual battery.

## DISCUSSION

### I. DID THE TRIAL COURT ERR BY OVERRULING ROBERTS'S MOTION TO SUPPRESS HIS STATEMENT?

¶13. Roberts filed a pretrial motion to suppress his statement to Officer Jack. He alleged that his statement had been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), because he previously had invoked his right to counsel and his right to remain silent. Specifically, Roberts contended that he had asked for an attorney while being taken into custody, that he had invoked his right to remain silent by refusing an interview with Officer Jack on the day of his arrest, and he had refused to sign the rights waiver form before his confession to kidnapping and statutory rape. The State filed a response denying that Roberts had invoked either right.

¶14. The trial court held a suppression hearing at which Officer Jack testified that, when Roberts was arrested, she had read him his *Miranda* rights and he never had requested an attorney, nor did he say that he wished to remain silent. Officer Williams and Officer Dareall Thompson gave testimony that they had been present at the traffic stop; and, although they did not hear everything that was said, they never heard Roberts invoke his right to counsel or say that he did not want to talk to the police. Officer Jack testified that she did not attempt to interview Roberts at the police department on the day of his arrest because he was combative and agitated, and he banged his head against the wall. Although he had calmed down by the time a nurse collected DNA samples from his body, Officer Jack informed him that she wanted to interview him later. Officer Jack's testimony seemed to conflict somewhat with her report, in which she had written that Roberts had "declined an interview." However,

8

Officer Jack testified that Roberts never had said that he did not want to talk and actually had indicated that he wanted to talk. She explained that she had written "declined an interview" because his behavior was not conducive to talking.

¶15. Officer Jack testified that, when she had interviewed Roberts two days after his arrest, she began by making light conversation with him for twenty minutes. When he asked "what is all of this," she read and explained his *Miranda* rights and presented to him the rights waiver form. She told him he did not have to sign the form, and that "I need your signature here for me to get your statement." Officer Jack testified that Roberts refused to sign the form and expressed concern about the rights he would give up by signing. After Roberts had refused to sign the rights waiver form, he proceeded to tell Officer Jack about his alibi and asked her to verify it. The conversation continued until he acknowledged having had sex with Tanya at the abandoned house. Officer Jack said that Roberts never asked for an attorney or said he wanted to stop the interview, and he did not otherwise indicate that he wanted to cease talking. She testified that she had made no threats or promises during the interview. In fact, the recording of the interview indicates that Officer Jack informed Roberts several times throughout that he was free to stop talking and terminate the interview.

¶16. Officer Jack testified that most of the interview was preserved on video, but that the final portion of it was preserved only on audio due to a recording malfunction. She also testified that the very end of the interview, after the confession, was not recorded. The recordings of the interview were admitted into evidence at trial.

¶17.   During the suppression hearing, Roberts testified that he was not given his *Miranda* rights when he was arrested. He asserted that he immediately had requested an attorney at the arrest scene, but an attorney never was provided. On direct examination, Roberts testified that he had asked for an attorney three or four times at the scene; on cross-examination, he said he had made the request three times. He testified that, although he had spoken with Officer Thompson at the scene, he had not asked him for an attorney because he already had made the request to Officer Jack. Roberts denied that he ever had become agitated or had banged his head on the wall at the police station.

¶18.   Roberts further testified that, during the interview, he had not believed he was being interrogated. He thought he was just having a conversation with Officer Jack and he did not believe he was incriminating himself. He admitted that he voluntarily had provided his alibi to Officer Jack. At the same time, he represented that, although Officer Jack had told him he could stop the conversation, he had not believed that he could stop it because he had been handcuffed and he had not felt free to leave. He said he thought that, by refusing to sign the rights waiver form, he was invoking his rights. Roberts also said that, although he had not requested an attorney during the interview, he had believed that his earlier request for an attorney, at the scene of his arrest, would be honored.  Roberts acknowledged that he never had said he wanted to remain silent.

¶19.   The trial court denied the motion to suppress, finding from the totality of the circumstances that Roberts's confession was admissible. The trial court recognized that, under *Miranda*, if the accused invokes his right to counsel, all interrogation must cease until

an attorney is present. *See **Downey v. State***, 144 So. 3d 146, 150-51 (Miss. 2014). The trial court found that Roberts had been advised of his ***Miranda*** rights at the scene based on the testimony of Officer Jack and also that, during the video recording, Officer Jack had asked if "we read you your rights out at the scene, right?" and Roberts agreed. The trial court also found that Roberts never had invoked his right to counsel. Although Roberts asserted that he had requested counsel at his arrest, testimony from Officer Jack and the other officers present all indicated that he had not, in fact, requested counsel at that time. Further, Roberts's consent to a search of his vehicle, consent to use of the rape kit, and his behavior at the interview, during which he never had requested counsel, supported the conclusion that he had not requested an attorney previously. The trial court concluded that "[w]hile the refusal to sign the [rights waiver] form may offer some support for his claim that he wished to speak to an attorney, all other evidence presented completely contradicts this argument by Defendant."

¶20. Regarding Roberts's right to remain silent, the trial court found from the video and audio recordings of the interview that he voluntarily had engaged in discussion with Officer Jack about the criminal allegations. The trial court noted that Officer Jack had told Roberts repeatedly during the interview that he did not have to give a statement and could stop the interview at any time. The trial court found that, despite this advice, Roberts voluntarily had continued to talk.

¶21. Roberts has limited his appellate attack on the denial of his motion to suppress to two arguments. First, he argues that he never waived the right to remain silent but rather invoked

11

that right by refusing to sign the rights waiver form. Second, he argues, for the first time on appeal, that any rights waiver was involuntary because it was induced by promises made by Officer Jack. Because Roberts does not take issue with the trial court's ruling that his right to counsel was not violated, that ruling has not been placed before the Court for review. Therefore, our analysis is limited to the arguments actually raised by Roberts.[2]

¶22. "In *Miranda*, the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires that the accused be advised of his right to remain silent and his right to counsel before any custodial interrogation." *Jordan v. State*, 995 So. 2d 94, 106 (Miss. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). But once the defendant has been advised of his *Miranda* rights, he may waive the rights and respond to police questioning. *Jordan*, 995 So. 2d at 106. "Waiver is considered voluntary if it is the result of a 'free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* A voluntary waiver is "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

¶23. If the totality of the circumstances establishes, beyond a reasonable doubt, that a waiver of rights was knowingly, intelligently, and voluntarily given, the trial court may admit the statement. *Id.* The totality of the circumstances includes consideration of the defendant's

---

[2] Roberts did not challenge the voluntariness of his confession before the trial court, and his motion to suppress was solely based on alleged violations of *Miranda*. Because Roberts did not challenge the voluntariness of his confession, we limit this analysis to the rights secured by *Miranda*. *See Benjamin v. State*, 116 So. 3d 115, 120 n.2 (Miss. 2013).

"experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation." ***Brown v. State***, 130 So. 3d 1074, 1079 (Miss. 2013). "When a trial court has overruled a motion to suppress the confession of a defendant, this Court will reverse the trial court's decision if the ruling was 'manifestly in error or contrary to the overwhelming weight of the evidence.'" ***Benjamin***, 116 So. 3d at 121. We also will reverse if the trial court applied an incorrect legal standard. ***Id.***

¶24.  If the accused invokes the right to remain silent, all interrogation must cease. ***Id.*** Roberts argues that his refusal to sign the rights waiver form was an invocation of his right to remain silent. Contrary to Roberts's argument, this Court has held that the accused's refusal to sign a rights waiver form is not a *per se* invocation of the right to silence. ***Jordan***, 995 So. 2d at 106. In ***Jordan***, the defendant refused to sign a rights waiver form, but this Court affirmed the admission of his confession. ***Id.*** at 107. As in this case, Jordan was given his ***Miranda*** warnings, and officers testified that he was not threatened or coerced. ***Id.*** Jordan stated that he did not want to sign the rights waiver form, but that he was willing to speak with the police. ***Id.*** He never expressed any desire to stop the interview, and he never requested an attorney. ***Id.*** This Court affirmed the trial court's finding that, under the totality of the circumstances, Jordan had not invoked his right to remain silent and had knowingly, intelligently, and voluntarily waived the right beyond a reasonable doubt. ***Id.***

¶25. We hold that the trial court's conclusion that Roberts had not invoked his right to remain silent and had knowingly, intelligently, and voluntarily waived the right was not manifestly in error or against the overwhelming weight of the evidence. Although Roberts did decline to sign the rights waiver form, he acknowledged that his very next acts included voluntarily informing Officer Jack of his alibi and responding to further questioning despite being advised several times that he could stop the interview at any point. He never in any way indicated an intent to limit the interview to questions about his alibi; rather, he continued to talk to Officer Jack despite being advised by her that he could stop the interview. Nothing tends to erode the trial court's conclusion that Roberts understood the *Miranda* rights. He had eleven years of schooling, he had obtained a GED, and recently he had worked as a truck driver. He had been arrested previously, and earlier in life he had passed examinations to be trained as a police officer in Mississippi and in Louisiana. The recordings of the interview support the trial court's finding that Roberts did not invoke his right to remain silent, and that he knowingly, intelligently, and voluntarily waived that right.

¶26. Roberts also argues that he did not voluntarily waive his right to remain silent because Officer Jack made promises that induced his waiver. A "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S. Ct. 2250, 2260, 176 L. Ed. 2d 1098 (2010). Roberts argues that his rights waiver was involuntary because it was induced by Officer Jack's statements that

14

"a decision will be made today whether you are charged, or not, with anything. So if you don't give me anything to fight for you with, then what can I do?" Officer Jack also said that "I just want you to let me fight for you if I can. And if you can tell . . . the truth, in regards to her contact with you . . . [t]hat would help." After Officer Jack made these comments, the discussion continued, and eventually Roberts confessed.

¶27. On cross-examination, Roberts was asked whether any promises had been made, and he said "yes." He was asked what Officer Jack had promised him, and he replied "Well, she just said that she's trying to help the situation, like me talking to her – but I didn't talk to her. I wanted an attorney from the traffic stop." That concluded Roberts's testimony about the alleged promises of leniency. There was no testimony, evidence, or argument that he had been induced to confess by Officer Jack's comments. Rather, Roberts argued that he had not understood his rights, that he had requested counsel, that he had invoked his rights by refusing to sign the rights waiver form, and that he had not felt free to stop the interview.

¶28. It is important to recognize that "[a] clear distinction exists between the voluntariness of a waiver of *Miranda* and the voluntariness of a confession itself under both the federal Due Process Clause and Mississippi law." *Keller v. State*, 138 So. 3d 817, 850 (Miss. 2014). Under the due process inquiry into whether a confession was voluntary, the trial court must determine from the totality of the circumstances whether the defendant's will was overborne by the circumstances surrounding the confession. *Dickerson v. U.S.*, 530 U.S. 428, 433, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000). Roberts's arguments challenging the admissibility of his confession before the trial court were limited wholly to *Miranda*; he never argued that

his confession was involuntary because it had been induced by threats or promises, or for any other reason. Nonetheless, "[a] defendant's confession may be allowed into evidence over objection only where the trial judge finds the confession was intelligently, knowingly, and voluntarily made, rather than bargained for with promises, threats, or inducements by law enforcement officers." ***Johnson v. State***, 129 So. 3d 148, 150 (Miss. 2013). And the fact that a confession was rendered involuntary due to inducement by threats or promises by law enforcement also implicates the voluntariness of the defendant's waiver of rights under ***Miranda***. ***Abram v. State***, 606 So. 2d 1015, 1034 (Miss. 1992), *overruled on other grounds*.

¶29.    Regarding appellate review of the admission of a confession, this Court has held that "[a]sserting grounds for an objection on appeal that differ[] from the ground given for the objection at the trial level does not properly preserve the objection for appellate review." ***Woodham v. State***, 779 So. 2d 158, 161 (Miss. 2001). Although the trial court made a finding that Roberts's confession was voluntary, his failure to argue before the trial court that coercive promises induced his rights waiver or his confession procedurally bars this issue on appeal. But even if Roberts had preserved the issue for appeal, it would not avail him, because there was no testimony or anecdotal evidence that he confessed because he was induced to do so by hope of reward or leniency. Considering the totality of the circumstances, including Roberts's age, education level, experience with the criminal justice system, suppression hearing testimony, and demeanor and responses in the recorded interview, nothing tends to show that Roberts's will was overborne by Officer Jack's comments. The trial court did not err by finding from the totality of the circumstances, beyond a reasonable

doubt, that Roberts's confession was freely and voluntarily given, and his rights waiver was knowingly, intelligently, and voluntarily made. Thus, notwithstanding the procedural bar, this issue is without merit.

> II. DID THE TRIAL COURT ERR BY DENYING ROBERTS'S REQUEST FOR PRODUCTION AND *IN CAMERA* INSPECTION OF MEDICAL RECORDS?

¶30. On the night before the incident, Tanya had visited a hospital complaining of constipation. Roberts filed a pretrial motion to obtain Tanya's medical records pertaining to this hospital visit on the basis that they potentially could be exculpatory. Tanya and her legal guardian refused to waive the medical privilege, and Roberts requested that the trial court subpoena the records and review them *in camera* to determine whether any portion was relevant, material, and exculpatory. The trial court denied the motion, and Roberts assigns that denial as error.

¶31. "In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion." ***Montgomery v. State***, 891 So. 2d 179, 182 (Miss. 2004). In ***Cox v. State***, 849 So. 2d 1257, 1272 (Miss. 2003), this Court addressed the question of whether the medical privilege should yield to a defendant's constitutional right to present a defense. The Court held that, while the medical privilege in most circumstances should be inviolate, "medical evidence pertaining to a victim may be secured and admissible in limited situations where the medical evidence is relevant, material and exculpatory." ***Id.*** The Court outlined the procedure to be followed by a trial court faced with adjudicating the defendant's request for information subject to the medical privilege.

17

*Id.* We said that it is appropriate for the trial court to perform *in camera* review of the medical records to determine whether they are relevant, material, and exculpatory. *Id.* Then, if the trial court finds any of the information to be admissible, the court should redact the information as much as possible so that the information admitted is limited only to that which is relevant, material, and exculpatory. *Id.* We relied on *Pennsylvania v. Ritchie*, 480 U.S. 39, 58-61, 107 S. Ct. 989, 1002-04, 94 L. Ed. 2d 40, 58-60 (1987), which held that the defendant has a constitutional due process right to all material information contained in statutorily privileged records. *Cox*, 849 So. 2d at 1272 (citing *Ritchie*, 480 U.S. at 58-61, 107 U.S. at 1002-04). The United States Supreme Court held that this right does not extend to review of the full records by a defendant or his attorney, but rather requires *in camera* review by the trial court with disclosure to the defendant of material information only. *Cox*, 849 So. 2d at 1272 (citing *Ritchie*, 480 U.S. at 58-61, 107 U.S. at 1002-04).

¶32. Roberts argues that the trial court erred by denying his request for *in camera* review of the records. He argues that the records may have been relevant, material, and exculpatory because they might have shown that Tanya had facial or vaginal injuries on the day before the alleged crime. We observe that, on appeal, Roberts puts forth a very different relevancy argument than the one he advanced before the trial court. There, he contended that the medical records of Tanya's hospital visit may have been relevant, material, and exculpatory because they might have indicated that Tanya had sexual contact with another man the day before the crime. We find that Roberts's argument that the records could have shown prior facial or vaginal injuries is procedurally barred because it was not raised before the trial

18

court. M.R.E. 103(a)(2). Notwithstanding the procedural bar, we provide a discussion of the trial court's denial of his motion for *in camera* review of the medical records and conclude that any error was harmless.

¶33. Before the trial court, the following discussion occurred concerning whether the trial court should inspect the medical records *in camera*:

> MS. MASSEY: Well, my client maintains his innocence, and I expect there to be a partial DNA match. And I think that if there is another source of semen, that – I don't know what was said or what else there could be done in that examination, because I don't know what all the nurse would ask you at the ER for that medical issue, but that would be a defense.
>
> THE COURT: You mean, if she had sex with someone the day before –
>
> MS. MASSEY: Well –
>
> THE COURT: Hold on. If she had sex with someone the day before this alleged incident, how is that a defense as it relates to the allegations because him [sic] because of their age?
>
> MS. MASSEY: It is my understanding that sperm would still be alive within 24 hours, and that if there is, that that could be the source of the sperm that was found, and that we would have to do DNA on that person.
>
> But if my person is maintaining their innocence, and I expect there to be testimony as far as DNA, if there is another source of DNA, I think that would be absolutely admissible as an exception.
>
> . . .
>
> THE COURT: So, Ms. Massey, I still want to go back, how does – if she had sex the day before – I don't know if she did or not, you don't either – but assuming she did, how does that relate to the charge against the Defendant when the victim cannot consent because of her age?
>
> MS. MASSEY: Because that partial Y match could match somebody else. I'm trying to get in that she had sex with somebody else the day before, not that in and of itself, no. But if there is a partial match, that doesn't mean there can't

be a partial match, under my understanding of what the Y match is, to somebody else. That's why it is only a partial match.

¶34. When asked by the trial court what she expected the hospital records to show, defense counsel responded that she thought that the medical providers might have asked Tanya whether and with whom she had been sexually active. The State argued that any evidence that Tanya previously had been sexually active was irrelevant and inadmissible under the rape shield laws. Citing *Cox*, the trial court refused Roberts's request for *in camera* inspection of the medical records, finding that, because the charge was statutory rape and Tanya was under the age of consent at the time of the alleged crime, it was irrelevant whether Tanya had engaged in sexual activity the day before the alleged crime.

¶35. Mississippi Rule of Evidence 412 governs the admissibility of evidence of the victim's sexual behavior in sex offense cases. Rule 412(a)(2) provides that "evidence of a victim's past sexual behavior" is not admissible except as provided by subdivisions (b) and (c). Subdivision (b) provides that "[t]he court may admit evidence of: (1) specific instances of a victim's past sexual behavior: (A) with a person other than the defendant, if offered by the defendant to prove that someone else was the source of semen, pregnancy, disease, or injury . . . ." M.R.E. 412(b)(1)(A). Thus, despite the fact that Tanya was unable legally to consent to sexual activity, a specific instance of her prior sexual behavior could have been relevant for its tendency to show that the source of the semen discovered on her pants was someone other than Roberts. Further, as defense counsel argued, if that other person were identified and his Y-STR profile obtained, a match of his Y-STR profile with the Y-STR

20

profile from the pants could have cast doubt on whether Roberts was the source of the semen.[3]

¶36.    Nonetheless, any error in the trial court's denial of the motion for *in camera* inspection of the medical records is subject to harmless-error analysis. Under harmless-error analysis, we do not "set[] aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." ***Chapman v. California***, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." ***Delaware v. Van Arsdall***, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

¶37.    The best that Roberts could have gotten from the medical records was that they revealed that Tanya had engaged in sexual intercourse with a different male on the day before the alleged crime and that this male was a likely source of the semen on Tanya's pants. But even if another person were the source of the semen on Tanya's pants, proof of prior sexual activity by Tanya could not negate the overwhelming evidence that Roberts committed a statutory rape against her on October 1, 2013. Roberts confessed to the crimes of kidnapping and statutory rape involving Tanya, and she identified him as the person who had kidnapped

---

[3] Our analysis focuses on the simple question of relevance and whether any possibility existed that relevant information could have been contained in the medical records, triggering Roberts's due process right to production of the records for *in camera* inspection. Whether the medical records actually contained anything relevant, material, or exculpatory is unknown. And, even if the medical records contained such information, it would be subject to being weighed under Rule 403 to determine whether its probative value exceeded its prejudicial effect. M.R.E. 403.

and raped her. She accurately described him – including his skin color, tattoos, and noxious odor – to the police. She also described accurately the abandoned house and had left her underwear in the house, which corroborated her testimony of what had occurred and where. Tanya recalled accurately that her abductor had driven a sports car with loud pipes. She spontaneously exclaimed "that's him," when she spotted him in her neighborhood – the same neighborhood in which the crimes had occurred and on the very day of the crimes – and she identified him at trial. Ample evidence demonstrated that Tanya exhibited behavior and physical findings consistent with her description of the crimes charged. Thus, we find that, notwithstanding the procedural bar, the error, if any, in the trial court's failure to conduct *in camera* review of the medical records was harmless beyond a reasonable doubt.

### III. WAS ROBERTS DENIED DUE PROCESS BY THE LOSS OF DEFENSE EVIDENCE?

¶38. During his interview with Officer Jack, Roberts asserted that he could not have committed the crimes because, at the relevant time, he had been at the WIN Job Center, then at Webb Hall. Officer Jack testified that, after the interview, she had asked another officer to investigate the alibi; but, as she had learned recently, that officer never did so. Officer Jack testified that, because Roberts had confessed to the crimes, she did not follow up with the officer about the alibi investigation. The campus police chief at Meridian Community College testified that there were surveillance cameras at Webb Hall, but that recordings were kept for only two weeks. He testified that no one from law enforcement ever requested video from those cameras.

¶39.  Roberts argues that the State's failure to obtain the video recordings from the cameras at Webb Hall constituted intentional destruction or spoliation of potentially exculpatory evidence in bad faith, entitling him to a new trial. This issue is procedurally barred from appellate review because Roberts never raised it before the trial court. *Crockett v. State*, 212 So. 3d 763, 766 (Miss. 2017). Recognizing this, Roberts requests that, if this Court finds that the issue was not preserved, we review it for plain error. "Under the plain-error doctrine, we can recognize obvious error which was not properly raised by the defendant on appeal, and which affects a defendant's 'fundamental, substantive right.'" *Smith v. State*, 986 So. 2d 290 (Miss. 2008) (quoting *Debrow v. State*, 972 So. 2d 550, 553 (Miss. 2007)).

¶40.  In support of his argument, Roberts cites *Tolbert v. State*, 511 So. 2d 1368, 1372 (Miss. 1987), which applied the holding of *California v. Trombetta*, 467 U.S. 479, 488, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984), that the State has a duty to preserve any evidence that might be expected to play a significant role in the defense. "To play a significant role in the defendant's case, the exculpatory nature and value of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means." *Tolbert*, 511 So. 2d at 1372 (citing *Trombetta*, 467 U.S. at 489, 104 S. Ct. 2528). Additionally, to comport with due process, "the prosecution's destruction of evidence must not have been in bad faith." *Tolbert*, 511 So. 2d at 1372. The intentional spoliation or destruction of evidence gives rise to an inference that the evidence would have disfavored the prosecution. *Id.* (citing *Washington v. State*, 478 So. 2d 1028, 1032-33 (Miss.1985)).

¶41. In *Tolbert*, the defendant argued that the State intentionally and in bad faith had destroyed a piece of exculpatory evidence when it lost a piece of skin that had been cut from his forefinger after a deadly shooting. *Id.* He argued that testing of this piece of skin could have proved that he had not fired the fatal shot. *Id.* Because nothing suggested prosecutorial bad faith, that the evidence had exculpatory value apparent before its destruction, or that the evidence would have played a significant role in the defense, this Court found no error. *Id.* at 1373.

¶42. Roberts's citation of *Tolbert* does not support his argument because his complaint is not that the State destroyed evidence that was in its possession, but that the police failed through its investigation to obtain certain evidence potentially favorable to his defense. Roberts cites no authority for the proposition that due process of law requires the State to use its investigatory resources to procure exculpatory evidence for use by the defense. Here, because the State never obtained the evidence, the evidence never was in the State's possession or control; so, obviously, the State did not lose, destroy or fail to preserve it. Therefore, notwithstanding the procedural bar, this issue is without merit.

> IV. DID THE TRIAL COURT ERR BY ALLOWING NATHAN HOLLY TO RENDER EXPERT OPINIONS NOT GIVEN TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY?

¶43. Roberts argues that the trial court should have excluded testimony from the State's expert in forensic analysis of DNA, Nathan Holly, about the partial Y-STR match between Roberts and the DNA extracted from the cutting of Tanya's pants. Holly testified that there are sixteen locations on the Y chromosome, and that he was able to raise a profile on eight

24

locations from the sample from Tanya's pants. All eight of these locations matched Roberts's profile. He testified that the partial Y profile from the sample on the pants occurred at a rate of one in 1,667 individuals in a database of 28,077 people. Thus, he concluded, Roberts could not be excluded as a donor of the DNA on the pants. Holly testified that Y-STR testing has a ninety-five percent confidence level.

¶44. After Holly's testimony, Roberts requested that his testimony be excluded and the jury instructed to disregard it.[4] Roberts contended that, because Holly had failed to state that his opinions were expressed to a reasonable degree of scientific certainty or expressed in terms of statistical probability, they were unreliable under Rule 702 of the Mississippi Rules of Evidence. The State responded that Holly had expressed his opinions in terms of statistical probability. The trial court denied the motion, finding that Holly's testimony had satisfied the strictures of Rule 702. Roberts argues that the trial court's ruling was error.

¶45. This Court reviews the admission or exclusion of evidence for abuse of discretion. *Johnson v. State*, 204 So. 3d 763, 766 (Miss. 2016). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[4] Regarding the timing of Roberts's motion to exclude Holly's expert testimony, this Court has held that "[a]lthough a pretrial motion and hearing challenging the admissibility of expert opinions may in some, if not most, cases be a prudent practice, this Court has held that this is not the exclusive means of mounting challenges to such testimony." *Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 754 (Miss. 2011). In *Hyundai*, we found that, in the absence of a contemporaneous objection, the trial court had not abused its discretion by refusing to strike expert testimony when the request had been made in a post-trial motion. *Id.* at 755. In *Hyundai*, the substance of the expert's testimony had been known to the defendants long before trial. *Id.* In this case, Roberts's motion was made after the testimony but during the trial, the trial court ruled on the merits, and it is far from certain that Roberts knew the exact substance of Holly's testimony prior to trial.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

M.R.E. 702. To be admissible under Rule 702, evidence must be both relevant and reliable. *Corrothers v. State*, 148 So. 3d 278, 294 (Miss. 2014). This Court has held that "the opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified." *Parvin v. State*, 113 So. 3d 1243, 1247 (Miss. 2013) (quoting *West v. State*, 553 So. 2d 8, 20 (Miss. 1989)). Opinions constituting mere speculation, or opinions expressed in terms of possibilities, are inadmissible. *Parvin*, 113 So. 3d at 1247.

¶46. Roberts specifically points to the following testimony of Holly, elicited during defense cross-examination, in support of his argument that the trial court should have excluded his opinion testimony:

> Q. Can you today state to a scientific certainty that Jafron Roberts deposited the biological sample that you identified as being placed on that pair of pants?
>
> A. I cannot. I can only state that he cannot be excluded.

He argues that, because Holly "could not state his opinion about the Y chromosome evidence within a reasonable degree of scientific certainty, or otherwise qualify his opinion as

26

scientifically reliable, the jury was left to speculate about whether the partial Y chromosome profile on Tanya's pants corroborated her testimony or not."

¶47. The problem with Roberts's argument is that it completely mischaracterizes Holly's testimony. Throughout his testimony, Holly was clear that the partial Y-STR match did not identify Roberts as the only possible donor of the sample from Tanya's pants, and that the scientific import of the partial Y-STR match was that Roberts could not be excluded as the donor. Holly did not express this opinion in terms of mere possibilities or speculation, but in terms of reasonable scientific certainty. He provided testimony on the frequency of the partial match of one out of every 1,667 people in the Y database, which contained 28,077 individuals. He specifically provided a margin of error, testifying that Y-STR testing has a ninety-five percent confidence level. He testified that Y-STR testing is considered to be reliable and it is widely accepted by the scientific community. The expert did not opine that Roberts was the donor – only that Roberts could not be excluded as the donor. The trial court's refusal to exclude Holly's testimony, as presented, was not an abuse of discretion.

> ## V. DID PRE-INDICTMENT DELAY RESULT IN A DENIAL OF DUE PROCESS?

¶48. Roberts argues that a delay of approximately one year between his arrest and his indictment violated his constitutional right to a speedy trial. Although he labels this error as a violation of his Sixth Amendment right to a speedy trial, his arguments attacking the State's delay in initiating the prosecution center on his due process rights under the Fifth Amendment to the United States Constitution. Therefore, once more we limit our analysis to Roberts's actual arguments.

¶49. While statutes of limitation form a bulwark of protection against the State's ability to bring overly stale charges, the Due Process Clause of the Fifth Amendment also provides some protection against oppressive pre-indictment delay. *U.S. v. Lovasco*, 431 U.S. 783, 788, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977). The defendant bears the burden of proof of showing that a pre-indictment delay constituted a due process violation. In *Hooker v. State*, 516 So. 2d 1349, 1351 (Miss. 1987), this Court adopted the two-part test articulated by the United States Supreme Court in *United States v. Marion*, 404 U.S. 307, 324, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971), and *Lovasco*, 431 U.S. at 795-96, 97 S. Ct. 2044. Under this two-part test, the defendant must show that "(1) the pre-indictment delay prejudiced that defendant, and (2) the delay was an intentional device used by the government to obtain a tactical advantage over the accused." *Killen v. State*, 958 So. 2d 172, 189 (Miss. 2007). "[D]ue process analysis must focus on factors such as the length of the delay, the reason for the delay and the prejudice which the delay may have caused the accused." *Hooker*, 516 So. 2d at 1351 (quoting *U. S. v. Johnson*, 802 F.2d 833, 835 (5th Cir. 1986)). Dismissal of the indictment is the remedy for pre-indictment delay that violates the Fifth Amendment's due process protections. *Marion*, 404 U.S. at 324, 92 S. Ct. 455.

¶50. The pre-indictment delay was brought to the trial court's attention solely by way of Roberts's demand for a speedy trial. At the July 16, 2015, hearing on the speedy trial demand, defense counsel acknowledged that DNA testing had been ongoing until April 3, 2015. The prosecutor said that initial DNA testing had been performed, but the crime laboratory later communicated that it could perform a Y-STR test, and the prosecution and

28

the defense had agreed to resend the samples for Y-STR testing. The defense requested a speedy trial, but did not seek dismissal of the indictment on speedy trial grounds or any other grounds. After these explanations, the trial court assured the defense that the case would move forward as soon as possible. And after a series of continuances requested by or agreed upon by the defense, the case was tried.

¶51.    Because Roberts never requested dismissal of the indictment based on a due process violation, this issue is procedurally barred. *Crockett*, 212 So. 3d at 766. Notwithstanding the procedural bar, the pre-indictment delay in this case did not violate due process of law. Roberts argues that the pre-indictment delay prejudiced him because the prosecution consciously chose not to investigate his alibi, causing the destruction of the video surveillance recordings he alleges would have shown that he was at Webb Hall at the time of the alleged crimes. As the State argues, the one-year, pre-indictment delay reasonably cannot be characterized as having caused the destruction of the video surveillance tapes, because those recordings routinely were destroyed a mere two weeks after they were made. Roberts also points to Karina Hodges Sims's testimony that she could not recall the date she had encountered Roberts at Webb Hall. He speculates that, but for the pre-indictment delay, she might have remembered whether she had seen him there on the morning that the crimes occurred. But "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from preindictment delay." *Beckwith v. State*, 707 So. 2d 547, 570 (Miss. 1997) (quoting *U.S. v. Beszborn*, 21 F.3d 62, 67 (5th Cir. 1994)). We find that Roberts has not shown prejudice.

¶52. We further find that Roberts has not shown that the delay was intentional and used by the prosecution to gain a tactical advantage over him. It is apparent from the arguments of the defense and the prosecution at the speedy trial demand hearing that obtaining DNA testing was a large part of the reason for the lengthy delay. In fact, nothing indicates that the State sought to hamper Roberts's defense by delaying indictment. In *Lovasco*, the United States Supreme Court observed that "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself[.]'" *Lovasco*, 431 U.S. at 791, 97 S. Ct. 2044. Therefore, even if this issue were not procedurally barred, it is without merit.

## CONCLUSION

¶53. We affirm. The trial court did not err in denying Roberts's motion to suppress his statement. The issue of the trial court's denial of Roberts's request for *in camera* inspection of Tanya's medical records is procedurally barred; notwithstanding the procedural bar, any error was harmless. Further, Roberts's argument that the State lost or destroyed evidence is procedurally barred; notwithstanding the bar, it is without merit. And the trial court did not abuse its discretion in admitting the expert testimony of Nathan Holly. Finally, because Roberts never requested dismissal of his indictment due to pre-indictment delay, he

30

is procedurally barred from raising that issue on appeal. Notwithstanding the procedural bar,

the pre-indictment delay in this case did not result in a violation of due process of law.

¶54.   **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KING, COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR.   BEAM, J., NOT PARTICIPATING.**