CHANDLER, Justice,
for the Court:
¶ 1. This is a direct appeal of Sacory Brown’s conviction for burglary of a dwelling. (Brown received a twenty-five year sentence, with eighteen years to serve and seven years suspended with five of those years on post-release supervision). On appeal, Brown argues that the Miranda warning he was given before making an inculpatory statement to the police was insufficient because it did not explicitly inform him of his right to stop talking to the police at any time. He also argues that the twenty-five-year sentence is grossly disproportionate in violation of the Eighth Amendment. Finally, he argues that the evidence supporting the verdict was legally insufficient and the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm Brown’s conviction and sentence.

FACTS AND PROCEEDINGS BELOW

¶ 2. On November 8, 2010, Cheryl McFarland was on her cell phone with her husband as she arrived back home from a doctor’s visit. She observed a strange red or maroon car in the carport. No one was in the car. Thinking perhaps that missionaries might have stopped by, which was common, she walked around to the front of the house to see if anyone was there. When she observed no one, she walked back around to the carport, where she *1077 observed that the door had been kicked in. She remained on the phone with her husband, reporting her observations to him. At that time, two men came running out the door. One had dreadlocks and the other a very short haircut. The one with dreadlocks came out first, choked her, and threw her across the carport. One of the men (she could not tell which because she was facedown on the carport) kicked her and hit her on the head with what turned out to be a .22 pistol taken from inside the house. The men got into the car and drove away. McFarland was bleeding from the head. Her cell phone had broken in the fall, so she went inside and called her husband from the landline. He called 911.
¶ 3. The .22 pistol was recovered after ambulance personnel observed it when driving away after treating McFarland. The suspects apparently had thrown it into the yard as they drove away. Part of the trigger guard (later found in the carport) was broken off. The police found no fingerprints on the scene matching Brown or his cousin. The checkered handle of the .22 was not analyzed for fingerprints because the investigator believed it was unlikely to yield any prints. McFarland stated that the color of the men’s car was in the “red” family, maroon or burgundy, and that she thought it was either a Honda or a Hyundai. After the burglary, she looked up car emblems online and came to believe that the car she had seen was a Hyundai.
¶ 4. Brown was developed as a suspect after the Jones County Sheriffs Department provided the Forrest County investigators with a car tag number associated with a similar recent burglary. That car belonged to Brown’s mother, Mary Brown. Investigator Clifford Rutter pulled over Mary Brown while on his way to her house to investigate the lead. The police learned from Mary Brown that her son, Sacory, frequently drove the car. The car was a Mazda. Mary Brown described it as candy-apple red. She agreed to put her son in touch with the police, and later drove Brown to the police station to be interviewed.
¶ 5. On Thursday, November 11, 2010, Investigator Rutter interrogated Brown after reading him the standard “Miranda Warning Form,” which contained the following statements:
YOU HAVE A RIGHT TO REMAIN SILENT.
ANYTHING YOU SAY CAN BE USED AS EVIDENCE AGAINST YOU IN COURT.
YOU HAVE A RIGHT TO TALK TO A LAWYER BEFORE QUESTIONING AND HAVE HIM PRESENT DURING QUESTIONING.
IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE QUESTIONING, IF YOU WISH.
Brown signed the waiver form in two places, indicating that he understood each of these rights and that he voluntarily waived them. He then handwrote the following statement:
My cousin asked if i would take him & his friend to see a chick. When we arrived my cousin friend went to knock and got no answer. So he decided that he wanted to go in since no one was there. He went in and when he came out, he pushed the lady down and we pulled off. I asked what was they doing and they said nothin just drop his friend off. Then my cousin told me that he didn’t get anything. Then I told’em they better not get me in trouble when The dude & Robert went in the dude kicked the door in. My cousin name is Robert Brown when she fell she screamed and they jumped in and we *1078 pulled off. They wanted me to pull off faster then normal.
¶ 6. After writing the statement, Brown was placed under arrest. Seven months after the burglary, McFarland failed to identify Brown in a photo lineup. But at trial, she identified him as the person who came out of the house first and choked her. She reiterated at trial that she saw only two men and that no one was in the strange car.
¶ 7. Both Brown and his cousin Robert Pickens Brown were indicted for burglary of a dwelling and aggravated assault. However, Brown was tried alone on both counts. A pretrial hearing was held in January 2012 on Brown’s motion to dismiss the indictment and suppress his incul-patory statement.
¶ 8. Brown’s mother, Mary Brown, testified that Brown had been diagnosed with a “Slow Learning Disability.” Although enrolled in special education classes, Brown graduated from Petal High School. He took care of himself on a day-to-day basis, and she trusted him to use her car frequently. Investigator Rutter stated that Brown struck him as very intelligent. Brown’s attorney questioned Rutter regarding the contents of the Miranda warnings, submitting that they were deficient because they did not contain an explicit warning that the defendant has the right to stop answering questions after interrogation has begun. Brown’s attorney attempted to renew this line of questioning at trial. The court sustained the State’s objection, saying, “[sjustained ... that has already been decided. That’s an issue of law and not an issue of fact.”
¶ 9. The court denied both the motions to dismiss and to suppress from the bench at the start of trial. Brown’s attorney requested, but never received, a written finding of fact as to why the motions were denied. The jury could not agree on the charge for aggravated assault and so a mistrial was declared on that count. After sentencing, Brown filed a motion for judgment not withstanding the verdict (JNOV) or, in the alternative, a new trial. He appeals the denial of these motions.

DISCUSSION

I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT BROWN WAIVED HIS MIRANDA RIGHTS.
¶ 10. We will not reverse a trial court’s finding that a Miranda waiver was valid where the finding was based on appropriate principles of law and is supported by substantial evidence. Chim v. State, 972 So.2d 601, 604 (Miss.2008); Holland v. State, 587 So.2d 848, 860 (Miss.1991). This standard is a mixed question of law and fact. Id. We review questions of law de novo. Rowland v. State, 42 So.3d 503, 506 (Miss.2010). Where the trial court has not made specific findings of fact, we review the record and make our own independent determination of the circumstances surrounding the defendant’s waiver of his constitutional rights. Holland, 587 So.2d at 860 (Miss.1991).
¶ 11. Brown argues that he did not make a valid waiver of his Miranda rights. In Miranda v. Arizona, the United States Supreme Court held that, when in custody, an individual “... must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.” Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The waiver must be made “voluntarily, knowingly and intelligently.” *1079 Coverson v. State, 617 So.2d 642, 647 (Miss.1998); see Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). “A waiver is voluntary if it is ‘the product of a free and deliberate choice rather than intimidation, coercion or deception.’ ” Coverson, 617 So.2d at 646. Additionally, “a waiver is knowing and intelligent if it is ‘made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.’ ” Id. “The judge must consider the totality of the circumstances to determine if a defendant intelligently, knowingly, and voluntarily waived his Miranda rights.” Scott v. State, 8 So.3d 855, 862 (Miss.2008).
¶ 12. Brown argues that an adequate Miranda warning must include explicit notice of the suspect’s right to cease the interrogation at any time. But Miranda does not require, and this Court has never required, that a defendant be explicitly informed of the right to stop answering questions. Smith v. State, 394 So.2d 1367, 1369 (Miss.1981); Bell v. State, 443 So.2d 16, 21 (Miss.1984). Rather, “the ‘four-fold’ warning, required by Miranda, ‘comprehends and includes the right of a suspect to terminate his questioning at any time he wishes.’ ” Smith, 394 So.2d at 1369 (quoting Robinson v. State, 228 So.2d 373, 376 (Miss.1969)). This Court has further stated that “(a)n individual has the right to stop the interrogation at any time he wishes, but it is not required that he must be so informed.” Interest of Wilder, 347 So.2d 520, 521 (Miss.1977).
¶ 13. Here, Brown was given the fourfold warning required by Miranda. The standard “Miranda Waiver Form” used throughout Forrest County included the four required warnings. These rights were read out loud to Brown, and Brown then waived those rights by signing the form in two different places. Because this four-fold warning inherently incorporates the right of a suspect to- stop answering questions and to cease the interrogation at anytime he wishes, the absence of an explicit warning of that right did not affect whether Brown’s waiver was knowing, intelligent, and voluntary.
¶ 14. Brown also argues that the judge’s failure to provide specific findings of fact should make the judge’s denial of the motions “clearly erroneous per se.” This Court stated in Gavin v. State that, “[pragmatically speaking it is essential that we have from our trial courts findings of fact upon which we may rely,” but went on to find that “[sjensitive to our inability to make findings of fact where the evidence is in substantial dispute, it nevertheless appears clear from the record before us that the [Miranda ] waiver was voluntary.” Gavin v. State, 473 So.2d 952, 955 (Miss.1985). In the absence of specific findings of fact from the trial court, “[tjhis Court must first conduct an independent review of the totality of the circumstances discoverable in the entire record in order to resolve the questioned validity of a confession or incriminating statements.” Coverson v. State, 617 So.2d 642, 647 (Miss.1993). This review includes consideration of the defendant’s “experience with the police and familiarity with warnings; intelligence, including I.Q.; age; education; vocabulary and ability to read and write in the language in which the warnings were given; intoxication; emotional state; mental disease, disorder or retardation.” Id.
¶ 15. Here, the record before this Court contains enough facts for us to find that Brown’s waiver was knowing, intelligent, and voluntary, despite the absence of specific findings of fact from the trial court. Brown came voluntarily to the police station to be interrogated. He was adequately informed of his Miranda rights before he signed the waiver. The interro *1080 gating officer thought he was very intelligent, and Brown voluntarily handwrote his own statement for the police.
¶ 16. Brown argues that his learning disability was not sufficiently considered as part of the totality of the circumstances in determining whether his waiver of his Miranda rights was knowing, intelligent, and voluntary. A suppression hearing to determine the admissibility of statements given during police interrogations should inquire into the mental capacity of an accused with limited intelligence to determine whether the accused had the mental capacity to understand and waive his Miranda rights. Coverson, 617 So.2d at 650.
¶ 17. Our independent review of the record shows that Brown’s learning disability does not rise to the level of mental disability required to have interfered with his ability 'to waive his rights. This Court has found valid waivers from defendants with much more severe disabilities and disadvantages than Brown. See McGowan v. State, 706 So.2d 231 (Miss.1997). In McGowan, the defendant knowingly, intelligently, and voluntarily waived his Miranda rights even though he was only 17, had a low I.Q., and read at fourth-or-fifth grade level. Id. at 284. And like Brown, McGowan waived his rights by signing a standard waiver form after the form was read to him by the interrogating officers. Id. Nineteen-year-old Brown graduated from high school, took care of himself, drove himself around town, and demonstrated literacy and an adult command of the English language by handwriting his inculpatory statement to the police. Brown possessed the capacity to waive his rights. Our review of the totality of the circumstances apparent from the record indicates the trial court did not err in finding Brown’s rights waiver to be knowing, intelligent, and voluntary.
II. THE TWENTY-FIVE YEAR SENTENCE WAS NOT GROSSLY DISPROPORTIONATE IN VIOLATION OF THE DEFENDANT’S EIGHTH AMENDMENT RIGHTS.
¶ 18. The Eighth Amendment’s prohibition on cruel and unusual punishment protects citizens from disproportionately lengthy sentences. Solem v. Helm, 463 U.S. 277, 286, 103 S.Ct. 3001, 3008-09, 77 L.Ed.2d 637 (1983). Determining whether a lengthy sentence is unconstitutional is a two-step process. First, the person seeking relief must show that the sentence itself “leads to an inference of ‘gross disproportionality.’ ” Nichols v. State, 826 So.2d 1288, 1290 (Miss.2002) (citing Hoops v. State, 681 So.2d 521, 538 (Miss.1996) (discussing Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991))). Generally, sentences that do not exceed the maximum punishment allowed by statute will not be considered grossly disproportionate and will not be disturbed on appeal, but in some circumstances, proportionality review of sentences is required. Hoops, 681 So.2d at 537. Second, if an inference of gross disproportionality is shown, the Court will conduct an analysis of the sentence under the three Solem factors, which are “(i) the gravity of the offense and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.” Solem, 463 U.S. at 290-92, 103 S.Ct. 3001.
¶ 19. Brown argues that his age, learning disability, lack of previous convictions, the lack of physical evidence tying him to entry of the property, the inability of McFarland to identify him in the lineup, and the lack of evidence that he committed *1081 any act of violence all lead to a reasonable inference that the maximum sentence of twenty-five years is grossly disproportional. However, when compared to relevant cases decided by this Court and the Court of Appeals, Brown’s circumstances do not warrant an inference of gross dispropor-tionality. In Hoops, this Court found no gross disproportionality for a thirty-year sentence with the possibility of parole when the defendant had shot two people. Hoops, 681 So.2d 521. Most recently, in Mosley v. State, a majority of this Court found that a total sentence of 126 years without the possibility of parole for a subsequent drug offender was not grossly disproportionate given the nature of the offense, and that the sentence did not exceed the maximum allowed by law. Mosley v. State, 104 So.3d 839, 840 (Miss.2012).
¶ 20. The Court of Appeals has approved twenty-five-year sentences for dwelling-house burglaries on a number of occasions. See Magee v. State, 966 So.2d 173 (Miss.Ct.App.2007) (a twenty-five-year sentence for burglary was within statutory limits, and a threshold comparison of defendant’s sentence with his crime failed to raise an inference of gross disproportionality); Martin v. State, 954 So.2d 535 (Miss.Ct.App.2007) (twenty-five years for burglary of a dwelling affirmed); McCollins v. State, 952 So.2d 305 (Miss.Ct.App.2007) (twenty-five years for burglary of a dwelling affirmed).
¶ 21. Although Brown received the maximum sentence, Brown’s sentence is within the amount allowed by statute. Brown was afforded a sentencing hearing after a presentence investigation and report. Additionally, seven years were suspended with five years on post-release supervision. Although Brown was not a repeat offender, when compared with the facts of multiple similar criminal convictions and sentences, Brown’s sentence is not grossly disproportionate; therefore, an extended proportionality review under the Solem factors is not necessary.
III. THE EVIDENCE PRESENTED AT TRIAL WAS NOT LEGALLY INSUFFICIENT, AND THE VERDICT WAS NOT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 22. Brown argues that the evidence presented at trial was not legally sufficient to support a guilty verdict, and that the verdict was against the overwhelming weight of the evidence. On appellate review for challenges to the legal sufficiency of the evidence, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (Miss.2005) (citing Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979)). When reviewing the weight of the evidence, “we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844.
¶ 23. To support his argument that the evidence is legally insufficient, Brown points to the absence of physical evidence that he entered the house or was at the scene. Brown’s fingerprints were not found at the scene. Brown further argues that McFarland’s testimonial evidence was unreliable and contradictory, particularly because she failed to identify him in a photo lineup. She also believed that the car driven by the perpetrators was a maroon Hyundai, when, in fact, the car linked to Brown was a bright red Mazda.
¶ 24. But Brown admitted to being at the scene in his statement to the *1082 police. Also, “[t]he absence of physical evidence does not negate a conviction where there is testimonial evidence.” Graham v. State, 812 So.2d 1150, 1153 (Miss.Ct.App.2002), cert. denied 828 So.2d 200 (Miss.2002). “The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity.” Jones v. State, 381 So.2d 983, 989 (Miss.1980); see also Hill v. State, 199 Miss. 254, 24 So.2d 737 (Miss.1946). The photographs admitted included pictures of the ransacked house, the broken door-frame, McFarland’s bloodied head, the gun in the grass, and Mary Brown’s red car. This was in addition to the testimony of McFarland and the statement Brown gave to the police admitting that he was present but that he had stayed in the car while two other people went in. From this evidence, a jury could reasonably find credible McFarland’s testimony that only two people broke into her home, that only two people came out of the house, and that Brown was one of those two people. A jury reasonably could accept that McFarland failed to identify Brown because the photo lineup occurred more than half a year after the incident. Viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient for a rational trier of fact to find all the elements of the crime established beyond a reasonable doubt.
¶25. And finally, the weight of the evidence supports the guilty verdict. When reviewing the weight of the evidence, “the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Bush, 895 So.2d at 844. Such an extraordinary case is not present here. As discussed above, the evidence presented at trial supported a finding that Brown broke into the McFarland home. Brown gave an inculpatory statement to the police, and the victim identified him at trial. He drove a car generally consistent with the description of the suspects’ car. We will not reverse a jury verdict on these facts. The evidence weighs in favor of a guilty verdict, rather than against it.
CONCLUSION
¶ 26. Law-enforcement officers are not required to inform suspects that they have the right to cease interrogation at any time. Brown’s maximum sentence of twenty-five years, with seven years suspended, does not violate the Eighth Amendment. The testimonial and crime-scene evidence presented at trial was sufficient for a rational trier of fact to find that all of the elements of burglary were met, and the verdict was not against the overwhelming weight of the evidence.
¶ 27. CONVICTION OF BURGLARY OF A DWELLING AND SENTENCE OF TWENTY-FIVE (25) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH EIGHTEEN (18) YEARS TO SERVE AND THE SEVEN (7) YEAR BALANCE SUBJECT TO FIVE (5) YEARS OF POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED.
WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, PIERCE, KING AND COLEMAN, JJ., CONCUR. KITCHENS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KING, J.