# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00318-COA

**DONALD RAY JOLLY**                                             **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/18/2021 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/17/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. A Neshoba County Circuit Court jury convicted Donald Jolly of four counts of statutory rape in violation of Mississippi Code Annotated section 97-3-65(1)(b) (Supp. 2017). The circuit court sentenced Jolly to serve life in prison for one count and three twenty-year sentences for the remaining three counts, with all sentences ordered to run consecutively. Jolly now appeals his convictions arguing that the trial court erred in denying his motion to suppress his statement to law enforcement. Jolly argued that he did not have the capacity to understand that he had the right to remain silent, the right to an attorney, or

any of the other accompanying rights; therefore, his statement allegedly was not knowingly, intelligently, or voluntarily made. After a review of the record, arguments of counsel, and relevant caselaw, we affirm Jolly's convictions and sentences.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶2. At eight years old, Stacy[1] began living with her father after her mother passed away. Stacy's father and Jolly were friends and neighbors. Over the years, Stacy and her siblings spent time with Jolly, riding four wheelers around their homes and hunting in nearby communities.

¶3. Stacy made allegations to family members that Jolly had been inappropriately touching her, and on January 7, 2020, Stacy was interviewed by Beth Reynolds, a forensic interviewer at the Wesley House Community Center ("Wesley House") in Meridian.[2] Officer Gordon Atkins, an investigator for the Neshoba County Sheriff's Department, was present during Stacy's interview at the Wesley House. After witnessing the interview, Atkins and other officers went to Jolly's home to locate him for questioning regarding Stacy's allegations. When Jolly was located, Atkins and Officer Brad Stuart detained and transported him to the Neshoba County Sheriff's Department.

¶4. When they arrived at the sheriff's department, Jolly was placed in Atkins's office.

---

[1] To protect the minor's identity and privacy, her name has been replaced with a fictitious name.

[2] The Wesley House's Child Advocacy Center conducts forensic interviews with children and teens when there are allegations of physical abuse, sexual abuse, or if they have witnessed a violent crime.

According to Jolly, Sheriff Eric Clark came and spoke with him for a moment after he arrived,[3] but his official interrogation was conducted by Atkins and Stuart.[4] Before the questioning began, Atkins read Jolly a *Miranda*[5] warning and waiver form. Jolly signed the waiver form and, thereafter, hand-wrote and signed a statement in which he admitted to having sex with Stacy.

¶5. On July 8, 2020, a Neshoba County grand jury indicted Jolly on four counts of statutory rape, and on March 8, 2021, the case was tried in the Neshoba County Circuit Court. At trial, the State called Stacy as its first witness. She testified about the allegations she made during her interview at the Wesley House. Stacy was unable to give specific dates, but she testified to three specific incidents where she alleged that Jolly raped her. According to Stacy, Jolly raped her many, many times. Stacy testified that the first time Jolly touched her inappropriately she was around the age of eleven.

**Direct Examination of Stacy:**

Q.     When did Mr. Jolly start doing things to you that you thought were inappropriate?

A.     When I was like 11, him and me and my brother were sitting in the car in the chicken house, the old chicken house.

---

[3] Jolly testified that the Sheriff Clark came in the office, turned his chair around, and got right up in his face. Jolly stated that the sheriff kept calling him a "M-F and all that stuff." Jolly also testified that the sheriff stated, "You sorry S-O-B. I had to throw you in the back with the rest of them jokers."

[4] The sheriff was not present during the official interview.

[5] *Miranda v. Arizona,* 384 U.S. 436 (1966).

. . . .

Q. Tell us what happened then.

A. He told my brother to go get a drink from the compost shed, the refrigerator out there, and after that he slowly put his hand on my leg, and that's when it started.

Stacy further testified that on one occasion, when she was around the age of thirteen, Jolly took her hunting. Usually Stacy's little brother went with her and Jolly hunting, but on this particular day, Jolly did not want her brother to go. Jolly and Stacy rode to Mt. Zion where his shooting house was located. According to Stacy, Jolly took her into the shooting house and told her to lie on the ground. Once on the ground, Stacy testified that Jolly put his "thing" inside of her after he pulled her pants down.

¶6. The State then called Atkins to testify. Atkins described how the Wesley House conducted children's interviews and where he was located on the day that Stacy had her interview. After Atkins witnessed the interview, he went back to Neshoba County to find Jolly. According to Atkins, he and other officers went to Jolly's residence but he was not there. The officers tracked Jolly down and took him to the sheriff's department. As anticipated, Jolly objected to the admission of his handwritten statement. As a result of the objection, the court then conducted a suppression hearing outside the presence of the jury.

¶7. During the suppression hearing, Jolly was asked whether Atkins went over the waiver form with him, and he stated that Atkins had not. Jolly stated, "He didn't give me no rights."

**Jolly Direct Examination**

4

Q. What about in his office? Did he read you those rights?

A. No, sir.

Q. Did he say that anything you say can be used against you in a court of law?

A. No, sir. He didn't say that.

Q. Did he tell you you can talk to a lawyer?

A. No, sir.

¶8. During the interrogation, Jolly gave both an oral and written statement to Atkins and Stuart.[6] Although he did write and sign the statement, according to Jolly, Atkins allegedly told him what to write.

**Jolly Direct Examination**

Q. Who gave you the words and the language to write down on those two pieces of paper?

A. Mr. Gordon told me what to say. He told me when he said that you had sex with you but you did not force her. I said I didn't – I ain't even writing that because I ain't had sex with nobody. He told me – he said, "If you want a bond, you know, you will."

¶9. In response to Jolly's testimony, Atkins and Stuart both testified during the suppression hearing. Both officers countered Jolly's testimony, stating that Jolly was fully advised of his *Miranda* rights and that he voluntarily gave his oral and written statements. Further, both officers denied promising Jolly a bond in exchange for his confession.

---

[6] Jolly's oral statement was not recorded.

5

**Atkins Direct Examination**

Q.   Prior to talking to the Defendant, was he advised of anything?

A.   Yes, sir.  His Miranda rights.

. . . .

Q.   Is that the Miranda form that was read to the Defendant?

A.   Yes, sir.

. . . .

Q.   The rights in that form – was he advised of those rights?

A.   Yes, sir.

¶10.   Jolly's written statement contained several misspelled words, and some were scratched through and marked with his initials.  In the statement, Jolly stated that he and Stacy had sex fifty to sixty times or more, but he never forced her.  Jolly identified specific places where he and Stacy engaged in sexual intercourse, including the shooting house in Mt. Zion, the fields by his house, and in the chicken house.  He further stated that he and Stacy were like boy-girl friends in a way.  Jolly was forty-seven years old at the time he wrote his statement.

¶11.   However, at the suppression hearing, Jolly stated that he never had sexual intercourse with Stacy.  Jolly argued that he only wrote and signed the statement because Atkins promised him that he would receive a bond.  Jolly also testified that on the day of the

6

interrogation, he had been up for a couple days and was on "crystal."[7]  However, Jolly admitted that he did not tell the officers this information because he did not want his boss and family members to know of his drug use.  Atkins and Stuart testified that Jolly did not appear to be under the influence of any drugs or alcohol while being questioned.  Based on their observations, Jolly fully understood his rights and that he was waiving those rights by signing the waiver.  Stuart testified that neither he nor Atkins threatened or offered Jolly any type of reward for his statement.

¶12.    At the close of the suppression hearing, Jolly argued that his statement should be suppressed because he was threatened and intimidated by Sheriff Clark and was not read his rights before he wrote his statement.  Jolly further argued that he did not understand he had the right to a lawyer or the right to remain silent, nor did he understand that he could ask for an attorney and stop the questioning.  According to Jolly, he was told that if he ever wanted a bond he would have to write a statement.

¶ 13.    After hearing testimony from Atkins, Stuart, and Jolly, as well as arguments of counsel, the circuit court found that "the Defendant was properly read his rights, . . . properly advised of [those] rights, and that he freely and voluntarily waived those rights."  Thus, the circuit court held that Jolly's confession was admissible.

¶14.    Testimony before the jury then resumed. Jolly testified and maintained his contention that he never engaged in sexual intercourse with Stacy.  Concerning his written statement,

---

[7] Crystal methamphetamine is the reference.

Jolly told the jury that he only confessed to having sexual intercourse with Stacy because Atkins promised him a bond in exchange for doing so. According to Jolly, he did not understand that he was confessing to having sex with Stacy when he wrote his statement. Jolly admitted that he did not really talk with the officers before he began writing out his statement. The officers just told him that they had some questions for him and that he needed to answer them. He further alleged that Atkins told him the words to write in his statement. At the end of the trial, the jury found Jolly guilty of all four counts of statutory rape.

¶15.     Jolly now appeals his convictions and sentences, raising as the sole issue whether the circuit court manifestly erred in denying his motion to suppress his statement because it was not knowingly, intelligently, nor voluntarily made.

**Standard of Review**

¶16.     In reviewing the trial court's denial of a motion to suppress a statement, the general rule that the "trial court sits as the fact-finder when determining the issue of whether an accused's confession has been intelligently, knowingly and voluntarily given." *Glasper v. State*, 914 So. 2d 708, 716 (¶21) (Miss. 2005). This court will "only reverse the trial court's determination of this issue when such determination is manifestly wrong." *Id*.

**Discussion**

¶17.     In order for a defendant's confession to be admissible, over an objection, the trial court must find that the confession was knowingly, intelligently, and voluntarily given and was not a product of police threats, promises, or inducements. *Johnson v. State*, 129 So. 3d

8

148, 150 (¶10) (Miss. 2013). In making this determination, the trial court sits as a finder of fact and considers the totality of circumstances. *Id*. This Court has stated that a defendant's "education; vocabulary and ability to read and write in the language in which the warnings were given" may be considered when examining the totality of circumstances. *Taylor v. State*, 291 So. 3d 14, 22 (¶25) (Miss. Ct. App. 2019) (citing *Roberts v. State*, 234 So. 3d 1251, 1260 (¶23) (Miss. 2017)). The supreme court has held that a defendant's mental ability is also a factor to be considered when evaluating the totality of the circumstances. *Moore v. State*, 287 So. 3d 905, 912 (¶12) (Miss. 2019). The State has the burden of proving the voluntariness of the confession, and "a prima facie case is made by testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward." *Id*. at (¶12). The trial court's determination will only be reversed if it was manifestly erroneous or contrary to the overwhelming weight of evidence. *Id*. at (¶11).

¶18. In this case, Jolly argues that his statement should have been suppressed for two reasons. First, he contends that his confession should have been suppressed because he lacked the capacity to understand that he had the right to remain silent, the right to an attorney, or any of the other accompanying rights. Jolly also asserts that his lack of capacity resulted from his limited ability to read and write, due to having minimal education and poor eyesight. Second, Jolly argues that his statement should have been suppressed because he wrote and signed the waiver in exchange for Atkins's promise that he would receive a bond.

9

### A.     Limited Capacity and Understanding

¶19.    The inability to understand what is being asked during an interrogation does not necessarily bar the admission of a confession.  Even when faced with a defendant whose primary language was not English, our supreme court found that he had been properly advised of his *Miranda* rights.  *See Chim v. State*, 972 So. 2d 601 (¶18) (Miss. 2008).

¶20.    In *Brown v. State*, 130 So. 3d 1074, 1080 (¶16) (Miss. 2013), Brown argued that the trial court had not sufficiently considered his learning disability in determining whether his waiver of his *Miranda* rights was knowing, intelligent, and voluntary.  After an independent review of the record, the supreme court found that "Brown's learning disability [did] not rise to the level of mental disability required to have interfered with his ability to waive his rights."  *Id*. at 1080 (¶17).  The supreme court in *Brown* cited *McGowan v. State*, 706 So. 2d 231, 234 (¶8) (Miss. 1997), for the holding that the "defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights even though he was only 17, had a low I.Q., and read at a fourth-or-fifth grade level."  *Brown*, 130 So. 3d at 1080 (¶17).  Both Brown and McGowan waived their rights by signing a standard waiver form after the form had been read to them by interrogating officers.  *Id*.  The court found that Brown possessed the capacity to waive his rights and that such waiver was knowing, intelligent, and voluntary despite his learning disability.  *Id*.

¶21.    Here, Jolly presented even less evidence of limited capacity than did Brown or McGowan.  He argues that he did not understand his rights or the waiver of them due to his

10

minimal education and poor eyesight. However, both officers testified that Jolly was given his rights and that he fully understood them. That Jolly's confession contained misspellings and grammatical errors only established his limited education, not a lack of understanding. Jolly never alleged that he had a mental disability or a low IQ. Even if Jolly had alleged that he had a mental disability, "the mental abilities of an accused are but one factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made." *Moore*, 287 So. 3d at 912 (¶21). It should also be noted that Jolly's statement was remarkably consistent with Stacy's testimony at trial. The trial court was in the best position to weigh the evidence and hear Jolly's testimony. *See Glasper v. State*, 914 So. 2d 708, 720 (¶28) (Miss. 2005). Considering the totality of circumstances, the circuit court was acting within its discretion in finding that Jolly's minimal education did not prove a lack of the capacity to voluntarily waive his rights. After reviewing the record, we find no merit to Jolly's argument that his minimal education should have barred the admission of his statement.[8]

### B. Threats and Coercion

¶22. Threats or coercion may prohibit the admissibility of a statement, but there must be proof in the record to support such an argument. In *Johnson*, 129 So. 3d at 150 (¶8), the defendant argued that his statement to law enforcement should have been suppressed because

---

[8] Jolly also argued that he did not have his glasses, but the record does not show he informed the officers of his need for them or that he asked for them.

11

it was coerced by a promise not to pursue charges against his fiancée. *Id*. The State called the officers who interrogated Johnson to testify during the hearing. *Id*. at 151 (¶14). Both officers testified that "neither promises nor threats were made to induce Johnson's confession." *Id*. "Officer McCombs testified that Johnson had asked whether [his fiancée] would be charged, and he had responded that, if Johnson admitted the cocaine was his, there would be no reason to charge [his fiancée]." *Id*. "The trial judge found that Johnson's testimony did not give rise to a credible argument that his confession had been coerced." *Id*. at 150 (¶8). On appeal, the supreme court held that "the trial judge did not commit manifest error by finding that Johnson voluntarily gave his confession." *Id*. at 153 (¶23).

¶23. Jolly argues that he only signed the waiver and statement because Atkins promised him a bond. Both officers denied promising Jolly any reward in exchange for his statement. The only evidence Jolly presented to refute this was his own testimony concerning what happened during the interrogation. As in *Johnson*, the court was tasked with weighing the credibility of the testimony of the officers versus the credibility of Jolly's testimony. In *Glasper*, 914 So. 2d at 720 (¶28), the supreme court stated:

> The trial judge in this case is the only one amongst the members of the judiciary who will ever have the opportunity to not only hear the testimony, but to also observe the demeanor of the witnesses as they testified at the suppression hearing. We thus afford the appropriate deference to the trial judge since she was the ultimate fact-finder based on disputed testimony offered at the suppression hearing. And the trial judge, sitting as the fact finder, had the sole authority to weigh the credibility of the witnesses and decide in the state's favor.

(Citation omitted).

12

¶24. After hearing all witnesses' testimony, the circuit court ultimately held that Jolly had been properly read his *Miranda* rights, properly advised of those rights, and that he freely and voluntarily waived those rights. Both Atkins and Stuart stated that there was no indication from Jolly's demeanor, words or actions that his waiver was not voluntary, and Jolly offered no evidence to refute the officers' testimony. *See Moore*, 287 So. 3d at 913 (¶26) (holding that testimony of interrogating officers was sufficient to establish a prima facie case of voluntariness). Giving the deference due to the circuit court's discretion in determining the credibility of witnesses, we cannot say that the circuit court's ruling was manifestly wrong.

**Conclusion**

¶25. Because the circuit court was not manifestly wrong in its decision to admit Jolly's confession, and because the testimony in the record supports that ruling, we affirm Jolly's convictions and sentences.

¶26. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**