# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-01103-SCT

*KEITH COLEMAN, JR. a/k/a K2*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/15/2023 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| TRIAL COURT ATTORNEYS: | AZKI SHAH |
| | CHRIS POWELL |
| | ALISON LESLIE FLINT |
| | MICHAEL STEPHEN CARR |
| | BRITTANY HERRIN DEAN |
| | JULIA GRAY STOWERS |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/29/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE COLEMAN, P.J., ISHEE AND SULLIVAN, JJ.**

**SULLIVAN, JUSTICE, FOR THE COURT:**

¶1.    In October 2019, April Jones and Will Polk were reported missing. The investigation

regarding their disappearance stalled until 2021. In 2021, Keith Coleman, Jr., confessed to

shooting and dismembering Jones and Polk.[1]

¶2. Coleman was indicted for two counts of first-degree murder, Counts I and II, and two counts of desecration of a corpse, Counts III and IV.[2] Coleman's trial testimony was considerably different from his previous statement. He asserted that Chelsea Golden, his girlfriend and the mother of one of his children, was the actual shooter and that his prior statement was an attempt to take the blame away from her.

¶3. At the conclusion of the trial, the jury found that Coleman was guilty of two counts of first-degree murder and guilty of two counts of desecration of a human corpse. The trial judge sentenced Coleman to serve two consecutive terms of life imprisonment. With regard to the two counts of desecration of a corpse, the trial judge sentenced Coleman to a term of three years for each count to run concurrent to the life sentences.

---

[1]He admitted also that Jayme Lynn Tubbs had helped him plan and carry out the shooting and helped in dismembering the victims' bodies. Along with Coleman, Tubbs was arrested and charged accordingly. The two were tried together. The jury found Tubbs guilty of the charged crimes.

[2]Coleman's initial indictment contained a total of six counts. After he was found guilty in his January 2023 trial, Coleman was granted a new trial based on a discovery violation. On September 8, 2023, the trial court entered an order restructuring the counts within the indictment as the parties had agreed to dismiss two of the six initial counts, *i.e.*, conspiracy to commit murder. Specifically, the trial court stated:

> THIS CAUSE having come on for retrial and upon action of the [c]ourt and agreement by the parties, does find that Counts I and II of this indicted cause, having been dismissed, should be replaced and Counts III, IV, V, and VI should be renumbered for reference.

Coleman's second trial began on September 5, 2023.

2

¶4.    Coleman appeals his murder convictions, arguing that the verdict is against the overwhelming weight of the evidence. This Court finds that his argument is without merit, and we affirm his convictions.

## FACTS

¶5.    On October 19, 2019, Jones and Polk were reported missing by their families. Police had few leads regarding their disappearance. But the investigation stalled, and the case turned cold.

¶6.    Coleman was a known drug dealer in Quitman County, Mississippi. He resided on Butler Road in Lambert, Mississippi. Two of Coleman's girlfriends, Golden and Cierra Wheeler, resided at the Butler Road house with the children they shared with Coleman.[3] During the time frame in which Jones and Polk went missing, Wheeler was residing at a different house located in Marks, Mississippi. Recognizing the dangers of having narcotics around his children and wanting to be closer to his clientele, Coleman started staying at a house in Crowder, Mississippi (Crowder house).[4] Coleman used the Crowder house to store and sell drugs. The house was described as a "drug house" with people coming "in and out" of the house. Both Jones and Polk were known to frequent the house to buy narcotics from Coleman.

---

[3]During this time frame, Coleman was dating several women. In addition to Golden and Wheeler, he was dating Rachel Russell.

[4]The owner of the Crowder house permitted Coleman to stay at the house in exchange for free drugs.

¶7.    In February 2021, the Quitman County Sheriff's Office hired Chief Deputy Peter Clinton. Some of his duties included reviewing cases that were pending, *i.e.*, cold cases, and partnering with the district attorney's office to investigate the reason people were sitting in jail for extended periods of time.[5] One of the cold cases that he reviewed and investigated was the disappearance of Jones and Polk. At the beginning of his investigation, two individuals were arrested after claiming to have been involved in the planning and killing of Jones and Polk.[6] Coleman, who was in jail for unrelated crimes, learned that one of the individuals was implicating him as being involved in the crime.

¶8.    In May 2021, Coleman escaped from the Quitman County Jail. He had received help during his escape attempt from the following individuals: Golden, Wheeler, and his father. As a result, each were charged accordingly for their part in aiding Coleman's escape. A short time after his escape, Coleman was apprehended in Arkansas. According to Deputy Clinton, Coleman told him that the reason he escaped was because his name came up in connection with the murder case.

---

[5]Deputy Clinton testified that the first interaction he had with Coleman was during his investigation about extended jail times, *i.e.*, how long individuals had been in jail and what their status was. He explained that Coleman was in jail for unrelated crimes and was the next individual listed to have his case reviewed.

[6]Deputy Clinton testified that Coleman denied the involvement of these two individuals and that he had explained that the two were "trying to get street cred, . . . but they [were] not involved with the killing or planning the death of [Jones] and [Polk]." On cross-examination, Deputy Clinton explained that the murder charges against these individuals had been dismissed based on "not just what Keith Coleman told me, but as well as other witnesses that [were] there at the murder/ambush."

¶9.	While being transported back to Mississippi, Coleman asked to speak with Deputy Clinton. At trial, Deputy Clinton stated that "prior to [his] escape, Keith Coleman was not on my radar as part of this investigation." Only after Coleman's name "came up" in an interview with another suspect and the discovery of Coleman's name in the original investigator's notes did Deputy Clinton decided that he "need[ed] to take a deeper look at this guy."

¶10.	On May 28, 2021, Deputy Clinton interviewed Coleman at the Panola County Sheriff's Office. During this initial interview, Coleman admitted to being with Jones and Polk and stated that they had been shot with his handgun. He agreed to take Clinton to the location where the crime happened.

¶11.	The following day, Coleman directed investigators to the location where he claimed the shooting took place, which was near the intersection of Riverside Road and Butler Road. At this time, Coleman proceeded to give Deputy Clinton the "runaround" by telling him a story about a drug deal gone wrong. Coleman claimed that Jones and Polk had been shot and killed by men who were trying to steal drugs from him. He claimed also that those same men forced him at gunpoint to participate in the "cutting up of the bodies." Despite placing himself at the scene of the crime, Deputy Clinton asserted that "some of the stuff [Coleman] was telling [him] was true, and this other part, [Coleman] was just adding stuff to it, as we got down to our final interview with him." The true version of events was not provided until later on in the investigation.

¶12.    Coleman advised the group that he was looking for a specific area marked by two fallen trees. After locating the two fallen trees further down Butler Road, Coleman told Deputy Clinton that "this [was] the location where they was killed – I mean the body was burned up in the woodlines." While law enforcement continued to investigate and search the area, Deputy Clinton took Coleman back to the jail.

¶13.    By the time the two arrived back at the jail, law enforcement officers had discovered a bag of human remains buried in a shallow grave. The items that were recovered from the bag were:  a human skull, finger bones, wrist bones, lower portions of the forearm bones, metal fragments, and jewelry, *i.e.*, two rings.[7] Forensic DNA Analyst George Schiro testified

---

[7]Anastasia Holobinko, an expert in forensic anthropology from the State Medical Examiner's Office, testified that the remains "appear[ed] to be consistent with those of a male" and that there was evidence of trauma to the bones. Additionally, she testified about the metal fragments that had been discovered with the bones. According to her,

> [T]he metal was of the fragment. It wasn't anything particularly distinguishable, as far as its shape. And the Standard and the Best Practices dictate that we generally refer to these as metal fragments, if it is identifiable as a projectile. And anything can be a projectile, actually. But projectile would be acceptable. Metal fragments, acceptable. And that's why I referred to it as a metal fragments, because that is related to the Forensic Anthropology Standards.
>
> . . . .
>
> . . . [W]hen we see something that – like, a fragment like that, that does not resemble an intact bullet, the practice would be to call it a fragment.

As a result, Holobinko said that she could not verify if the fragments were or were not a bullet.

that after comparing the DNA from the skull with that of a swab taken from Polk's mother, Amanda Smith, the "[t]ooth's DNA profile is approximately 42 thousand times more likely, if Amanda Smith is his mother, as opposed to a randomly selected person in the population. . . . And the probability of maternity in this case was 99.998 percent." Additionally, Polk's mother identified the jewelry as belonging to her son.

¶14.    Deputy Clinton testified that, after learning of this discovery, Coleman stated he "want[ed] to tell [Clinton] everything that happened." Coleman believed that Jones had stolen his drugs and guns from the Crowder house in early October. Coleman reached this conclusion because Jones and Polk were continuing to get high despite the fact that the two had stopped asking him for drugs. In order to send a message, Coleman and Tubbs devised a plan "to get [Jones] off to herself and beat her up and let her know, you can't steal from me." The plan was for (1) Tubbs to get Jones by herself by driving Rachel Russell's car to Taco Bell, (2) Tubbs with Jones in tow would meet up with Coleman, and (3) Coleman would attack and beat Jones.

¶15.    Tubbs located Jones and was successful in convincing her to get in the car. According to Deputy Clinton, Tubbs told him that Polk, who initially was not a part of the plan, got into the vehicle because he "would not allow them just to take [Jones]." Later, Tubbs texted Coleman informing him that Polk had gotten in the vehicle with Jones. There were four

individuals in the vehicle: Tubbs, Jones, Polk, and Dezimond Green.[8] Both Jones and Polk were in the rear passenger seats of the car.

¶16. While Tubbs was carrying out her part of the plan, Coleman went to the Butler Road house to set up the ambush site. Upon arriving at the house, Coleman pointed a gun at Golden and demanded that she help him set up the ambush site. Golden refused until Coleman pointed the gun at their son, threatening to shoot him if she did not comply. Ultimately, Golden agreed to help Coleman with his plan and drove him to an area off of Butler Road. There, Coleman proceeded to stage the scene in a way that would give Tubbs a reason to stop. He positioned the hood of the vehicle to appear as if the car was broken down on the side of the road, providing Tubbs an excuse to stop and help.

¶17. After staging the scene, Coleman took his handgun and hid in the woods as he waited for Tubbs to arrive with Jones and Polk. Golden remained standing by the vehicle. A few moments later, Tubbs arrived and stopped the vehicle as planned. Everyone except Jones exited the vehicle and approached Golden's car. Jones remained in the rear passenger seat. Leaving his hiding spot in the woods, Coleman approached Tubbs's car, dragged Jones out of the car, and began pistol-whipping her. At some point, Jones attempted to run away. In response, Coleman continuously shot her until she fell. Clinton testified that when asked why he continued to shoot Jones, Coleman responded, "[s]he wouldn't die. She wouldn't drop

---

[8]Although Dezimond Green was in the car, he is not a party in this case. His involvement was adjudicated in a separate proceeding.

dead."

¶18.    With his hands raised, Polk began pleading that he would not say anything. In response, Coleman said, "I know" and shot Polk in the chest. After shooting Jones and Polk, Coleman concealed their bodies in the woods, and the group dispersed. Coleman dropped Golden off at the Butler Road house and rendezvoused with Tubbs and others at the Crowder house. The group then checked in at a hotel to discuss the next steps.[9] Afterwards, Coleman and Tubbs went to Walmart to purchase supplies to dismember and burn the bodies. They returned to the site where the bodies were hidden and proceeded to take the bodies further into the woods to begin dismembering them. They removed the victims' heads and hands, placing them into bags, and burned the rest of the remains. Coleman's reasoning for the dismemberment of the bodies was due to his fear that the bodies could be discovered and "easily identified by their hands." Initially, Coleman stashed the bags at the Butler Road house. He proceeded to hide the bags in the trunk of Wheeler's car. Coleman also gave Wheeler a bag of clothing and told her to burn the bag at Gates Lake. The following day, Coleman retrieved the bags from Wheeler's trunk, threw the bag with Jones's remains in a body of water near his property, and buried the bag with Polk's remains.

¶19.    In addition to testifying about Coleman's confession, Deputy Clinton testified that Coleman's codefendant, Tubbs, had corroborated Coleman's version of events and identified

---

[9]The individuals at the hotel were Coleman, Tubbs, Russell, and another individual.

9

Coleman as having shot Jones and Polk. He explained that Coleman had provided him a hand-drawn diagram of the exact location where the killing had occurred and where the bodies were. Additionally, Clinton asserted that Coleman had informed him that, at one point, Coleman's phone had contained an image of the dismembered body parts. According to Clinton, the existence of the photo was corroborated by Tubbs and Wheeler. Clinton testified that he had advised Coleman that certain individuals had been arrested in aiding his escape. But he denied threatening Coleman, stating specifically:

> [S]ome of the investigative tools is to let [Coleman] know that we already got leads on his name coming up in our investigation. So, not a threat. Not as any coercion. He was read his rights. He had every opportunity to seek an attorney, when I read his rights. So, he talked to me on his own free will.

On cross-examination, Clinton confirmed that none of the witnesses to the crime had come forward prior to Coleman's arrest, explaining, "[t]hat's normally how cold cases work." Additionally, he acknowledged that cold cases can be difficult to solve because evidence is either not found or destroyed due to the passage of time.

¶20.    The State also called Golden and Wheeler to testify at trial. Golden testified that Coleman came into the Butler Road house and demanded that she help him because he was going to kill Jones. She stated that when she refused, Coleman held a gun at her and their son, threatening to kill them. Reluctantly, Golden drove Coleman down Butler Road until he told her to stop. Coleman did not point his handgun at her while she was driving. In addition to Coleman's handgun, she testified that a rifle was in the passenger front floorboard of the car.

10

¶21.    She confirmed that Coleman staged the car to appear as if it was in need of assistance and that he hid in the woods until Tubbs arrived. When asked why she did not leave while Coleman was hiding in the woods, Golden asserted that he had a gun and that she did not know where he was. She confirmed also that she was standing next to the car when Tubbs's vehicle approached and that everyone except Jones exited the vehicle. Additionally, Golden testified that at some point, Tubbs cocked the rifle and handed it to Golden, instructing her to "hold it on [Polk]." She stated that she pointed the rifle at the ground because she refused to point it at Polk. On the stand, Golden described watching Coleman drag Jones from the car, beat her, and then shoot Jones until she fell. She confirmed that Coleman shot Polk in the chest with his handgun, not the rifle. According to Golden, she watched Coleman throw a backpack containing Jones's remains in a body of water near the Butler Road house. As for the bag containing Polk's remains, she stated that she watched Coleman "walk down the woodline and take a right with a [shovel]."

¶22.    Golden explained that she did not approach the police sooner because she was afraid of Coleman and believed that she would die "as soon as [she] opened [her] mouth." She only agreed to cooperate with the police because Coleman was "locked up" and she felt that "the truth need[ed] to be told[.]" On cross-examination, the defense questioned whether she had been the one to shoot Polk, which she vehemently denied.

¶23.    Wheeler confirmed that Coleman had given her a bag to burn at Gates Lake and that he had placed additional bags in the trunk of her car. Wheeler believed that she had "felt a

11

nose or an ear" inside one of the bags that Coleman had placed in her vehicle. When asked if she had inquired about the contents of the bags or the reasoning behind burning one of the bags, Wheeler stated she did not because "[y]ou don't question [Coleman]." She testified that Coleman showed her a picture from his phone that depicted a dead body in the fetal position.

¶24. Like Golden, Wheeler testified that she did not approach law enforcement because she was afraid of Coleman and "[b]ecause [Coleman] was still out." Both Golden and Wheeler testified that each had tried to leave Coleman. But their attempts failed. As Wheeler stated, there "[w]asn't no leaving [Coleman]." Additionally, both denied that their testimony and cooperation in this case was a condition to receive a lighter sentence, *i.e.*, non-adjudication, for their part in aiding Coleman's escape.

¶25. Coleman elected to testify at trial. Coleman's testimony was mostly consistent with the statement given to Deputy Clinton. On the stand, Coleman admitted:  1) creating a plan to get Jones alone in order to attack her, 2) setting up the ambush site, 3) meeting up at the hotel, 4) purchasing supplies at Walmart with Tubbs, 5) removing the heads and hands of the victims, and 6) disposing of the victims' remains. His testimony only diverged from his earlier statement concerning the events that occurred at the ambush site and who shot and killed Jones and Polk.

¶26. Coleman claimed that when he asked Golden to go "ride with [him]," she did so willingly. He denied pointing a gun at Golden or their son. After arriving at the ambush site, Coleman asserted that he removed the clip from his pistol, leaving him with an unloaded

handgun. He testified that he did so because he "was going to use the pistol to pistol-whip [Jones]" and he "didn't want it to accidently go off[.]" Prior to Jones's and Polk's arrival, Coleman "told [Golden] to get [the rifle] and make sure don't nobody get involved." Coleman then proceeded to testify that as he was beating Jones with his pistol, he heard a gunshot and turned to see Polk lying on the ground. As he went to check on Polk, he stated that he saw that the rifle was in Golden's hands. While checking on Polk, Coleman heard four or five more shots, which had been directed at Jones. He said that he "snatched the gun out of [Golden's] hand[s]" and threw it away from her. Coleman testified that Golden had motive to shoot Jones and Polk. Coleman asserted that Polk was shot because he had attempted to interfere with the beating. As for Jones, Coleman asserted that Golden shot Jones because she had seen a video of Coleman and Jones having sex and because Jones had stolen drugs from Coleman. Coleman testified that he told Golden, "[d]on't worry about whatever else happen. If anything come up, I'll take the blame for it." According to Coleman, it was not his intent for Jones and Polk to end up dead, claiming that Jones was fine and still breathing after he assaulted her.

¶27. Coleman claimed that he made a deal with Deputy Clinton: charges against Golden and his other loved ones would be dropped in exchange for Coleman admitting to the crimes. He asserted that this was his reasoning behind asking to speak with Deputy Clinton in the first place. Additionally, Coleman testified that Golden had been brought into the interrogation room during the interrogation process. Coleman asserted that he never shot

13

anyone and confessed only to prevent Golden from being arrested. He stated that he changed who the shooter was in order to "make sure [Golden] didn't get charged. I would have rather seen my son with his momma than with me."

¶28. In response to Coleman's recantation, the State called Deputy Clinton as a rebuttal witness. He rebutted Coleman's claim that Golden went with him willfully and that Golden had been present during Coleman's interrogation. Deputy Clinton stated that the only individuals in Coleman's interrogation was "myself, Keith Coleman Junior, as well as Detective Darryl Linzy." Earlier during the trial, Golden also denied Coleman's claim. Specifically, she testified, in relevant part:

> Q: You see him right over there at the jail, outside of it right? When he's about to be interviewed by [Deputy] Clinton, right?
>
> A: He was already interviewed.
>
> . . . .
>
> Q: You see him and law enforcement takes you over to him and you're able to talk to each other, right?
>
> A: No.
>
> Q: You give on [sic] each other a hug, right?
>
> A: No.
>
> . . . .
>
> Q: You just see each other and that's it?
>
> A: Yeah.

14

Q: Okay. So, if there's testimony that y'all had contact and talked about this . . . , that would be a lie, wouldn't it?

A: Yes.

¶29. On rebuttal, Deputy Clinton also denied that he had made a deal with Coleman or that he had threatened to bring criminal charges against Golden and Wheeler.[10] When asked if there was any evidence that showed Golden as being the shooter, Deputy Clinton said, "No. We investigated this to the fullest and we found no evidence that [Golden] at all fired a firearm."

¶30. On September 9, 2023, the jury found Coleman guilty on all counts. On September 18, 2023, Coleman filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial, which was denied.

## DISCUSSION

¶31. This Court has held that

"When reviewing challenges to the weight of the evidence, this Court views the evidence 'in the light most favorable to the verdict.'" ***Pulliam v. State***, 328 So. 3d 93, 97 (Miss. 2021) (quoting ***Little v. State***, 233 So. 3d 288, 292 (Miss. 2017)). "This Court will not disturb a jury verdict on a weight-of-the-evidence challenge, unless we find that the verdict 'is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable justice.'" ***Thames v. State***, 310 So. 3d 1163, 1174 (Miss.

---

[10]Specifically, the State asked:

Q: Did you pretend? Did you claim that you had something on [Golden] and [Wheeler], to get him to say things?

A: No. Absolutely not.

15

2021) (quoting *Potts v. State*, 233 So. 3d 782, 791 (Miss. 2017)).

*Moore v. State*, 348 So. 3d 322, 327 (Miss. 2022). "During such an inquiry, we afford the State 'the benefit of all favorable inferences that may reasonably be drawn from the evidence.'" *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008) (quoting *Griffin v. State*, 607 So. 2d 1197, 1201 (Miss. 1992)). "The standard for reversing a jury's verdict as against the overwhelming weight of the evidence is very high." *Jones v. State*, 390 So. 3d 498, 503 (Miss. 2024) (internal quotation marks omitted) (quoting *Collier v. State*, 183 So. 3d 885, 893 (Miss. 2016)).

¶32.   Coleman asserts that "[a]llowing the murder convictions in this case to stand would sanction an unconscionable injustice" and asks this Court to reverse his murder convictions and remand for a new trial. He asserts also that "[e]ven viewing the evidence in a light most favorable to the State, the weight of the evidence does not support the guilty verdicts in this case." Coleman argues that "[t]he State's evidence comes from unreliable sources" as two witnesses had ulterior motives for implicating Coleman and that his confession was the result of his wanting to protect Golden. Additionally, he claims there was no physical evidence that linked him to the crime or that "support[ed] the State's version of events over [his]." In response, the State asserts that the verdict was not against the weight of the evidence as "[s]ave only for [Coleman's] testimony doubling back on his earlier confession, all the evidence established Coleman murdered Will and April."

¶33.   The substance of Coleman's arguments amount to issues regarding the credibility of

16

the witnesses. "Issues of fact and credibility are the primary responsibility of the trier of fact. Accordingly, this Court should not reweigh the facts nor substitute its judgment for that of the fact finder as to credibility issues." *Williams v. State*, 391 So. 3d 1151, 1158 (Miss. 2024) (internal quotation marks omitted) (quoting *McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 152 (Miss. 1999)). "Conflicting testimony does not evince overwhelming evidence; '[w]here the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict.'" *Brown*, 995 So. 2d at 702 (alteration in original) (quoting *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988)).

¶34. Even though there was conflicting testimony, both parties were able to offer their theory of the case to the jury. At trial, Coleman presented his theory that his initial confession was the result of a deal made with police in exchange for dropping the criminal charges against those that helped him escape from jail. Additionally, Coleman was given the opportunity to explain the reason for his recantation and to identify Golden as the actual shooter. The defense was able to present its theory that Golden and Wheeler had ulterior motives for testifying against Coleman. Throughout the trial, the jury heard from multiple witnesses that Golden and Wheeler had been charged with aiding Coleman's escape and that they were not promised leniency in exchange for their testimony. The jury heard testimony regarding how Coleman was not on the police's radar when he willingly confessed to killing and dismembering Jones and Polk. Because the jury is the "judge of the weight and credibility of testimony," it is "free to accept or reject all or some of the testimony given by

17

each witness." ***Jones***, 390 So. 3d at 503 (internal quotation mark omitted) (quoting ***Meshell v. State***, 506 So. 2d 989, 992 (Miss. 1987)); *see* ***Renfro v. State***, 118 So. 3d 560, 565 (Miss. 2013) ("'[I]nconsistencies in witnesses' testimony do not require the jury to reject the entire testimony' of a witness." (quoting ***Duncan v. State***, 939 So. 2d 772, 782 (Miss. 2006))). We find that this is what occurred in this case. After hearing and considering the evidence, the jury accepted the State's verison of events and rejected Coleman's version.

¶35.　Regarding Coleman's lack-of-physical-evidence argument, this Court has determined that "[t]he absence of physical evidence does not negate a conviction where there is testimonial evidence." ***Brown v. State***, 130 So. 3d 1074, 1082 (Miss. 2013) (alteration in original) (internal quotation marks omitted) (quoting ***Graham v. State***, 812 So. 2d 1150, 1153 (Miss. Ct. App. 2002)). Here, plenty of testimonial evidence supported that Jones and Polk were shot, killed, and dismembered by Coleman. The jury was able to reach a verdict without the need of physical evidence. *See* ***Williams***, 391 So. 3d at 1158 ("Issues of fact and credibility are the primary responsibility of the trier of fact." (internal quotation mark omitted) (quoting ***McFadden***, 735 So. 2d at 152)).

¶36.　This Court will not disturb the jury's decision regarding the weight given to each witnesses' credibility and the evidence. Viewing the evidence in the light most favorable to the verdict, we find that the verdict is not against the overwhelming weight of the evidence.

## CONCLUSION

¶37.　This Court finds that allowing Coleman's murder convictions to stand would not be

an unconscionable injustice. Therefore, we affirm Coleman's murder convictions.

¶38.  **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., MAXWELL, CHAMBERLIN, ISHEE, GRIFFIS AND BRANNING, JJ., CONCUR.**